**STATE of Delaware,**

v.

**Jermaine M. WRIGHT, Defendant.**

**Cr.A. Nos. IN91–04–1947R1 to IN91–04–1953R1.**

Superior Court of Delaware, New Castle County.

Submitted: June 9, 1994.
Decided: Aug. 12, 1994.

 

Richard E. Fairbanks, Jr., Chief of Appeals Div., Ferris W. Wharton, Deputy Atty. Gen., and Loren C. Meyers, Deputy Atty. Gen., Dept. of Justice, Wilmington, for State.

Joseph M. Bernstein, Wilmington, for defendant.

## OPINION

Del PESCO, Judge.

This is the Court's decision on defendant Jermaine Wright's motion for postconviction

relief pursuant to Superior Court Criminal Rule 61. Defendant was convicted of two counts of Murder First Degree, Robbery First Degree, and related weapons offenses. Pursuant to 11 *Del.C.* § 4209(d)[1], a jury unanimously found the existence of circumstances statutorily mandating the imposition of the death sentence. This Court concurred, and in its sentencing decision of October 22, 1992, defendant was sentenced to death by lethal injection. *State v. Wright,* Del.Super., Cr.A. No. IN91–04–1947—1953, Del Pesco, J. (Oct. 22, 1992) Sent. Dec. (*Wright I* ) Defendant appealed the imposition of the death sentence to the Supreme Court of Delaware and on November 17, 1993, defendant's death sentence was affirmed. *Wright v. State,* Del.Supr., 633 A.2d 329 (1993). (*Wright II* ) On December 16, 1993, this Court entered a resentencing order which directed that the sentence of death be carried out on March 30, 1994. *State v. Wright,* Del.Super., Cr.A. No. IN91–04–1947—1953, Del Pesco, J. (Dec. 16, 1993) Order. (*Wright III* ).

On January 24, 1994, defendant filed this motion for postconviction relief pursuant to Superior Court Criminal Rule 61. On February 15, 1994, this Court entered a stay of execution pending the outcome of this postconviction motion. This Court held an evidentiary hearing on May 17 and 18, 1994, at which time forensic psychologist Gerald Cooke, M.D., defendant's trial attorney, and David A. Ruhnke, Esquire, an expert in defending capital cases, testified. On June 9, 1994, oral argument on the motion for postconviction relief was presented to the Court. The parties have completed briefing, and the motion is now ripe for adjudication. This is the Court's decision on the motion.

## I.

The essential facts underlying Wright's conviction are set forth in detail in the Supreme Court decision. *Wright II,* 633 A.2d 329. For purposes of this motion, the following description of the crime, taken *verbatim* from this Court's sentencing decision, is sufficient:

The crime, as described by the defendant—a description which the jury clearly accepted as true, which comports with the physical evidence, and which is consistent with the testimony that the victim was not a man to surrender the cash in his register, even at gun point—occurred when the defendant and [co-defendant Lorinzo] Dixon entered the Hi–Way Inn, demanded cash, were denied the cash by the victim who then reached across to the left with his right hand, apparently to unplug the cash register, and was shot in the back of the head. The defendant admits on the video-taped confession to firing the gun one time, under threat from Dixon. Mr. Seifert was shot three times. The wound which the defendant admits inflicting and describes on the videotape was a mortal wound, according to the Medical Examiner. The testimony at trial from an eyewitness who saw two black men flee from the murder scene, was that the two men exited, then one went back in and then fled. He said the shorter of the two men went back in. It was very clear from the testimony of Mr. Seifert's co-worker who was in an adjoining room, that there was one shot, a brief passage of time, then two more shots. The defendant is shorter than Lorinzo Dixon. Dixon has pled guilty to the charges of Robbery First Degree and Possession of a Deadly Weapon During the Commission of a Felony. The compelling conclusion is that the defendant was the one who returned to inflict the final shots.

*Wright III,* Op. at 8–9.

Defendant was charged and convicted of two counts of Murder First Degree (inten-

---

1. Delaware's capital sentencing statute reads, in pertinent part, as follows:

(d) *Determination of sentence.*—(1) A sentence of death shall be imposed, after considering the recommendation of the jury, if a jury is impaneled, if the Court finds:

a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

b. By a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.

11 *Del.C.* § 4209(d)(1) (1988).

tional and felony-murder), Robbery First Degree, and three counts of Possession of a Deadly Weapon During the Commission of a Felony. The jury unanimously found that the State had established two statutory aggravating circumstances—the murder was committed in the course of a robbery, 11 *Del.C.* § 4209(e)(1)(j), and the victim was 62 years of age or older, 11 *Del.C.* § 4209(e)(1)(r) and that the aggravating circumstances outweighed the mitigating circumstances. 11 *Del.C.* § 4209(d)(1).

The Superior Court, charged with the ultimate responsibility for determining whether the death sentence should be imposed, also found that the State had established the two statutory aggravating circumstances in addition to three non-statutory aggravating circumstances—Wright's career as a drug dealer, the Emil Watson shooting[2], and the brutality of the Seifert murder. The trial court, which had ordered a presentence investigation of Wright, also discussed Wright's "evolving pattern of violence" in its sentencing decision and concluded that the aggravating circumstances "completely overwhelm[ed]" the mitigating circumstances. *Wright II*, 633 A.2d at 332. Therefore, in accordance with 11 *Del.C.* § 4209(d), the Superior Court sentenced Wright to death by lethal injection on both murder convictions.[3]

## II.

Defendant alleges, as his ground for post-conviction relief, that his trial counsel was ineffective. Specifically, he contends that his counsel was "unprepared to present evidence of 'mitigating circumstances;'" that his trial counsel "failed to procure a psychological evaluation of defendant which would have disclosed evidence of mitigation circumstances;" that his counsel "had no knowledge of penalty hearing jurisprudence and was therefore unprepared to present evidence of mitigating circumstances;" that his counsel "failed to request appropriate instructions to jury concerning mitigating circumstances;" that his counsel's "decision to present an 'alabi' [sic] defense in the face of the court's pre-trial ruling allowing defendant's confession into evidence" was improper; and his counsel's "decision as part of the defense case to portray the defendant as a highly successful drug dealer" was in error. Defendant's Motion at 3.

[1–5] Defendant's allegation that he was denied the effective assistance of counsel is controlled by *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) and its progeny. Under *Strickland*, Wright must first show that defense counsel's representation fell below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. He must then show that defense counsel's deficiencies were so prejudicial that they deprived him of a fair trial. *Id.* Accord, e.g. *Albury v. State*, Del.Supr., 551 A.2d 53, 60–61 (1988); *Stevenson v. State*, Del.Supr., 469 A.2d 797, 799 (1983). "A fair trial is denied when the conviction or sentence resulted from a breakdown in the adversarial process that rendered the result unreliable." *Deputy v. State*, Del.Super., Cr.A. No. IK79–11–0232–0235R1, IK79–03–0011, 0013R1, Steele, J. (Dec. 27, 1990) (*Deputy I*) aff'd, Del.Supr., 602 A.2d 1081 (1991) (*Deputy II*). In other words, in order to show prejudice, defendant must show that there is a reasonable probability that but for defense counsel's errors, the result of the trial or penalty hearing would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Accord, e.g.*, *Skinner v. State*, Del.Supr., 607 A.2d 1170, 1172 (1992); *Flamer v. State*, Del.Supr., 585 A.2d 736, 753–54 (1990); *Riley v. State*, Del. Supr., 585 A.2d 719, 726–27 (1990) (*Riley II*). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. When applying the *Strickland* standard, there is a "strong presumption that

---

**2.** In the case of *State v. Jermaine Wright*, Cr.A. Nos. IN91–03–0425 and 91–03–0426, Wright was charged with assault second degree and possession of a deadly weapon during the commission of a felony. The indictment charged defendant with shooting Emil Watson, a juvenile, in the foot. On the morning Wright was arrested, he discussed the incident with the police and admitted to shooting the boy in the foot.

**3.** Wright was also sentenced to 20 years in prison for the robbery and 30 years for the weapons offenses.

counsel's conduct falls within a wide range of reasonable professional conduct." *Id.* at 689, 104 S.Ct. at 2065. In addition, this Court must eliminate from its consideration the "distorting effects of hindsight" when evaluating counsel's representation and strategic decisions. *Deputy I,* Op. at 4 *citing Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

"All ineffectiveness of counsel claims are judged by the *Strickland* standard. The standard of reasonable competency is not heightened simply because a death penalty is qualitatively different than life imprisonment." *State v. Riley,* Del.Super., Cr.A. Nos. IK82–05–0058–61, 1988 WL 47076, at *3 (Apr. 29, 1988) (*Riley I* ), *aff'd,* Del.Supr., 585 A.2d 719 (1990) (*Riley II* ). The burden under *Strickland* is on the defendant. The defendant must prove his allegation of ineffective assistance of counsel by a preponderance of the evidence. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

### A. Alleged errors during the guilt phase of the trial

The State's case was based, in large part, on a videotaped confession made by Wright wherein Wright admitted to participation in the Hi–Way Inn robbery/homicide and shooting the victim once, under coercion from the co-defendant, Lorinzo Dixon. Prior to trial, defense counsel sought to have defendant's confession suppressed as evidence. After the September 30 and October 1, 1991, suppression hearing, this Court ruled that defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent and that his confession was voluntarily made; thus, the defendant's motion to suppress the videotaped confession was denied. *State v. Wright,* Del.Super., Cr.A. No. IN91–04–1947—1953, Del Pesco, J. (Oct. 30, 1991) Letter Op. Therefore, defense counsel knew before trial that Wright's confession would be seen and heard by the jury in the guilt phase of the trial.

In order to combat this potentially damning evidence against his client, defense counsel prepared a five-pronged defense strategy focused on Wright's innocence. Defense counsel chose this strategy after spending countless nights in Riverside, the public housing community in which defendant lived, searching out character witnesses and eye witnesses.

First, defense counsel sought to attack the reliability of the confession by showing that Wright was under the influence of heroin .at the time of his arrest and that Wright continued to use heroin during the interrogation. Wright testified that he merely repeated on the videotape what the police officers told him to say so he could be left alone to enjoy his "high." To support the claim that Wright's confession was unreliable due to the influence of drugs, defense counsel presented the testimony of Robert Maslansky, M.D. Dr. Maslansky testified that the effect of Wright's drug intoxication created a significant doubt as to the truthfulness and reliability of the confession.

Second, defense counsel presented the defense of alibi. In support of this defense, defense counsel presented several witnesses who testified that Wright was with them shooting pool at the time of the Hi–Way Inn robbery/homicide.

Third, defense counsel tried to convince the jury that another man had committed the crimes. He did this by presenting other witnesses who testified that they observed an unknown black male a short distance from the Hi–Way Inn immediately after the shooting. These witnesses testified that the man was acting strangely and avoiding the police.

Fourth, defense counsel presented testimony that indicated that Lorinzo Dixon,[4] his alleged accomplice, was at a movie with a girlfriend at the time the shooting occurred.

Fifth, defense counsel presented evidence, through Wright and Wright's mother, that Wright had no motive for the petty theft because he was a highly successful drug dealer who did not need the money in the cash register of the Hi–Way Inn; thus, he would have had no reason to participate in the robbery.

4. In his videotaped confession, Wright implicated Lorinzo Dixon as the second participant in the robbery/homicide at the Hi–Way Inn. There-

fore, in order to show that Wright's confession was unreliable, it was important to show that Dixon had an alibi at the time of the crimes.

**1. Whether defense counsel's decision to present an alibi defense was objectively unreasonable and caused prejudice to the defendant.**

■ Defense counsel testified at the May 18, 1994, evidentiary hearing that because Wright had confessed to committing the crimes with Lorinzo Dixon, defense counsel felt the most successful plan would be to try to convince the jury that Wright did shoot Mr. Seifert, but only because Dixon forced him to. However, defense counsel further testified that Wright would not admit to that and vehemently maintained that he had nothing to do with the robbery or the shooting. Defense counsel testified that Wright insisted from the very beginning of his representation that he did not do it. Defense counsel's only option at that point was to defend Wright on the ground that he was innocent.

In order to support Wright's claimed innocence, defense counsel chose to rely on the defense of alibi and mistaken identity. To prepare for Wright's trial, defense counsel went to Riverside night after night for several weeks to attempt to develop an alibi for Wright or Dixon. Defense counsel testified that he was able to interview several people who could support Wright's alibi. In addition, defense counsel was also able to establish an alibi for Dixon. Defense counsel also testified that, through his work on the streets of Riverside, he was able to learn from an eye witness that another man, who was not Wright, was seen hiding from the police just after the murders. Because of the evidence he gathered on the street and because Wright continued to maintain his innocence, defense counsel proceeded with the alibi defense.

■ The reasonableness of defense counsel's conduct was influenced by Wright's choice to present an innocence defense. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Defense counsel's actions and strategic decisions were based on informed choices made by the defendant and such choices must be taken into account by this Court in properly assessing defense counsel's strategic decisions. *Id.*

■ Also in assessing defense counsel's decisions, this Court must avoid peering through the lens of hindsight. *See Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) ("[f]rom the perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more successful.") Rather, it is necessary for this Court to analyze counsel's conduct based upon all of the facts of this case which were known to defense counsel at the time of the trial. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065. Only from that vantage point can this Court properly determine whether, in light of all the circumstances, defense counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2065. Furthermore, it is vital that in evaluating counsel's conduct, this Court "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Following the authority of *Strickland*, Wright has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. In fact, defense counsel's actions in preparing for the alibi defense by searching out witnesses in the streets of Riverside demonstrated an extraordinary commitment to the defense of Jermaine Wright.

**2. Whether decision to portray the defendant as a highly successful drug dealer was objectively unreasonable and caused prejudice to the defendant.**

■ Faced with the jury seeing and hearing Wright's confession which was consistent with the physical evidence presented to the jury regarding the entry and exit points of the three bullets, counsel presented evidence designed to convince the jury that Wright's confession was unreliable and coerced. To support his argument, defense counsel hired an expert, Dr. Robert Maslansky, to testify that Wright's drug intoxication could effect the voluntariness and reliability of Wright's statements to police. As a foundation for

that testimony, uncontested evidence was presented to show that Wright had heroin on his person during the entire time he was in police custody and until he was delivered to the Department of Corrections later that evening. In addition, his demeanor on the videotaped confession differed significantly from his demeanor in the courtroom and on the witness stand, supporting the claim that he was under the influence of drugs during the confession.[5]

The jury knew, therefore, that Wright was a drug user. The jury was obviously aware that drugs cost money and that much crime is motivated by the need to support a drug addiction. Finally, the jury also knew that Wright did not have a job, his family members were poor, and he did not have a girl-friend who was supporting him. With only this information, it would have been logical for the jury to conclude that Wright's motive in committing the crime was the need to support a drug habit.

█ Defense counsel, therefore, combated this likely conclusion by presenting evi-

dence that Wright did not need the money to support a drug habit because he had a source of funding—drug dealing. The decision to portray Wright as a successful drug dealer, who would have no need for the money, was a strategic decision made by defense counsel after much consideration.[6] Although under normal circumstances, a defense attorney would not want to portray a client as a "successful drug dealer," the existence of a videotaped confession and the inference which the jury could draw from the attack on the confession presented defense counsel with a difficult strategic choice. It cannot be said that defense counsel's portrayal of his client as a "successful drug dealer" is *prima facie* ineffective without viewing the circumstances in which it was presented. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2065.

---

**5.** It was likely that the jury, upon watching the videotaped confession, would be aware that Wright was under the influence of an intoxicant at the time he made the statements. Wright's mannerisms in the courtroom were alert, lively, and energetic. On the videotape, however, Wright was lethargic and sluggish.

**6.** The following testimony was elicited from Wright's defense counsel on cross exam during the evidentiary hearing:

Q Now, obviously there's a decision which has to be made whether to present that as part of your guilt phase evidence or not to present that information about his being a drug dealer, having money and, therefore, no motive to commit this robbery, whether to present that or not present that at the guilt phase. Is that correct?
A Correct.
Q You recognize there's a—you know, this is something you present or something you don't present and there's an up side and down side to either course ... Did you discuss that with him?
 * * *
A Yes. When I talked to him about that, I advised him that it was quite likely that evidence of his drug dealing and drug involvement would not come into the record, number one, because apparently the police didn't know he was a drug dealer. He had never been arrested for it, I don't think, and I don't think he was ever a priority drug person from the vice squad people that I talked to knew about—I never—I don't

think they—and I told him, I said, you know, if we win with this, it's gonna hurt you both at the guilt phase and the penalty phase because, I said, you know, there are jurors—despite what we say and despite how hard we try to pick them, they're gonna say he's a drug dealer. He's a bad guy, therefore, he must've done this crime too. It's just sort of human nature. Some people feel that way despite the best instructions.

We talked about that, and his position was, ... that's the truth. That's what we're going to go to [sic] with. I'm not going to changing [sic] anything. I'm not going to hide anything. That's the way it is. That's what we're gonna do.
Q Did you discuss that option with his mother as well?
A Yes.
Q And—
A And his sister.
Q In fact, everybody, all—
A His—there was [sic] only two family members that were—there was his mother and sister. So I constantly—every time I met with his mother I met with his sister. I met with his sister even more than his mother, and we constantly talked about that. They were all aware of the—that that was a two-edged sword, that it was gonna cut both ways.
Q Okay. And that decision to go ahead and present that evidence, was that a joint decision by—
A Absolutely a joint decision.
Hr'g Tr. at 141–44.

Although defense counsel's strategy, in retrospect, was unsuccessful, it is not proper for this Court to determine ineffectiveness based on outcome. *See Fretwell,* — U.S. at —, 113 S.Ct. at 842 ("An analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.") Defense counsel's actions must be evaluated from his perspective at the time he presented the defense. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Thus, this Court finds that defense counsel made a reasonable strategic decision. Wright has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*

### B. Alleged errors during the penalty phase of the trial

The penalty hearing, which lasted less than an hour, consisted of two witnesses for the prosecution—Detective Robert Merrill [7] and the victim's son, and two witnesses for the defense—Wright's mother and Wright's girlfriend. In his closing statement, defense counsel told the jury that the defendant was "looking for mercy." Penalty Hr'g Tr. at 11. Defense counsel then reminded the jury that the defendant was "born to an unwed mother, that he grew up in poverty, that his father was missing from his life, that he was failing in school, and that he was introduced to the use and sale of drugs by older boys in the neighborhood" and that he has "kids that he loves and cares for." *Id.* at 12. Finally, he explained to the jurors that "[n]othing is gained by the death penalty. It doesn't correct the wrong. It doesn't restore the life. It doesn't relieve the pain and suffering to the victim's family. It only causes more pain and suffering for other innocent people." *Id.* at 12–13.

---

7. Detective Merrill was the officer who investigated the Emil Watson shooting and first questioned defendant about his involvement in that shooting.

8. Superior Court Criminal Rule 61(i)(4) states:

### 1. Whether defense counsel's failure to request different instructions to the jury concerning mitigating circumstances was ineffective causing prejudice to the defendant.

In his appeal to the Delaware Supreme Court, Wright argued that the jury instructions given during the penalty phase of his trial were insufficient with respect to the definition of mitigating circumstances. The trial Court defined a mitigating circumstance in the jury instructions as "any factor which tends to make the defendant's conduct less serious or the imposition of a penalty of death inappropriate." In its November 17, 1993, opinion, the Supreme Court specifically addressed the sufficiency of the jury instructions and found that they were patterned after those approved by the Delaware Supreme Court in *Flamer v. State,* Del.Supr., 490 A.2d 104 (1983), and *Riley II,* 585 A.2d 719, and did not violate the Eighth or Fourteenth Amendments. *Wright II,* 633 A.2d at 335–39.

Having litigated on direct appeal the adequacy of the instructions on consideration of mitigating evidence, Wright cannot now claim in his motion for postconviction relief that his trial counsel was ineffective for failing to request different instructions. *See Skinner,* 607 A.2d at 1172–73, (defendant could not, on motion for postconviction relief, claim that his trial counsel was ineffective for failing to request certain jury instructions where it was decided on direct appeal from his conviction that such jury instruction was not required.)

Superior Court Criminal Rule 61(i) requires the movant to satisfy substantial procedural requirements before this Court will consider the substantive merits of a motion for postconviction relief. *Younger v. State,* Del.Supr., 580 A.2d 552, 554 (1990); *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). One of these procedural requirements is set forth in Rule 61(i)(4).[8] Rule 61(i)(4) requires that any

---

(4) **Former Adjudication.** Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsid-

grounds for relief which were formerly adjudicated are procedurally barred unless consideration of the claim is warranted in the interest of justice. Super.Ct.Crim.R. 61(i)(4). The interest of justice has been narrowly defined to require the movant to show that the trial court lacked the authority to convict or punish him. *Flamer*, 585 A.2d at 746. Wright has provided no support for the proposition that this Court lacked the authority to convict him; thus, he has not met his burden of establishing that reconsideration is warranted in the interest of justice. Therefore, having been formerly adjudicated in his direct appeal to the Supreme Court, Wright's claim regarding the adequacy of the jury instructions is procedurally barred by Rule 61(i)(4). *Younger*, 580 A.2d at 556.

 The Court acknowledges that Wright's claim of ineffective assistance of counsel was not addressed by the Delaware Supreme Court on direct appeal, *see Duross v. State*, Del.Supr., 494 A.2d 1265 (1985); nevertheless, the Supreme Court's previous rejection of Wright's substantive claims and its finding that the jury instructions were adequate precludes Wright from establishing that he was prejudiced by the instructions given. Therefore, Wright has failed to satisfy the prejudice prong of *Strickland. Skinner*, 607 A.2d at 1171. Furthermore, Wright cannot simply refine or restate an issue that has been previously resolved and expect the Court to re-examine it. *Id.* at 1172; *Riley II*, 585 A.2d at 721.

**2. Whether defense counsel's failure to investigate potential mitigating evidence and failure to argue available mitigating evidence to the jury was objectively unreasonable and caused prejudice to the defendant.**

 During the penalty phase, the jury must determine: (1) whether the evidence shows beyond a reasonable doubt the existence of at least one statutory aggravating circumstance and (2) whether, by a preponderance of the evidence, the aggravating circumstances outweigh any mitigating circumstances found to exist. 11 *Del.C.* § 4209(c). The jury's determination of these issues serves as a recommendation to the Court which must, after considering the jury's determination, consider the same questions. *Wright II*, 633 A.2d at 335.

 Wright argues that defense counsel was ineffective for failing to investigate Wright's mental and emotional background. He contends that if defense counsel had sought to obtain Wright's school records, he would have learned that Wright had been evaluated to determine whether he was eligible for special education programs; that he had repeated the second, fifth, and sixth grades; and that he was withdrawn from school in the eighth grade due to excessive absences.[9] He further contends that defense counsel was ineffective because he did not engage a psychiatrist or psychologist to evaluate Wright.[10]

The State argues, in response, that Wright has shown no facts which would have led defense counsel to believe a psychological evaluation was necessary, or would have been helpful. The State claims that, except to describe Wright as antisocial or dyssocial, the psychological exam prepared by Dr.

---

eration of the claim is warranted in the interest of justice.
Super.Ct.Crim.R. 61(i)(4).

9. This information concerning Wright's educational history was not presented to the jury. It was obtained by the Court after the penalty hearing as a result of a formal presentence investigation which was requested by the Court because of the extremely brief penalty hearing.

10. Contrary to defense counsel's statement during the evidentiary hearing that Jermaine got convicted because he was poor, the failure to investigate Wright's mental and emotional history cannot be excused based upon financial constraints. The record reflects that although Wright's counsel was privately retained by members of Wright's family who had difficulty raising the funds to pay for experts, the Court approved the payment of funds for the experts when requested, so as not to affect the pending trial date. No request for funds for a psychological evaluation or any other penalty phase evidence was ever presented.

Cooke in connection with this postconviction motion has not illustrated any fact not presented to the jury or known to this Court. Furthermore, the State argues that this additional information would not have changed the Court's sentencing decision. *See De-Shields v. Snyder*, D.Del., 830 F.Supp. 819, 825–26 (1993).

█ In addition, defense counsel testified at the evidentiary hearing that he did not believe a psychiatric examination would have been helpful because there was no indication that Wright was insane or incompetent to stand trial.[11] The fact that a defendant is not mentally defective or incompetent does not mean that the defendant does not have other potentially mitigating conditions and disorders. *See Kenley v. Armontrout*, 8th Cir., 937 F.2d 1298 (1991). "In fact, evidence of conditions, disorders and disturbances are precisely the kinds of facts which may be considered by a jury as mitigating evidence." *Id. See also Eddings v. Oklahoma*, 455 U.S. 104, 114–15, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982).

The State further argues that "[t]he determination of what evidence to present in a penalty phase hearing is a strategic decision." *DeShields*, 830 F.Supp. at 825. *See also Burger v. Kemp*, 483 U.S. 776, 790–95, 107 S.Ct. 3114, 3123–26, 97 L.Ed.2d 638 (1987); *Zettlemoyer v. Fulcomer*, 3d Cir., 923 F.2d 284, 299–300 (1991).

█ While there is no absolute duty to present all potentially mitigating evidence for use at the penalty stage, defense counsel has a general duty to investigate potentially mitigating evidence. *Flamer*, 585 A.2d at 756–57. Counsel can make reasonable choices about what factors stand the best chance of convincing the jury not to impose death and may focus its investigation on uncovering evidence related to those particular factors. *Id.* However, from the perspective of strategic competence, "defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors." *Kubat v. Thieret*, 7th Cir., 867 F.2d 351 (1989) *cert. denied sub nom., Kubat v. Greer*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). *See also Horton v. Zant*, 11th Cir., 941 F.2d 1449, 1462 (1991) (a "strategic" decision cannot be reasonable where the attorney has failed to investigate his options and make a reasonable choice between them.)

The psychological report prepared by Dr. Cooke revealed the following conclusions and opinions:

· Testing of intellectual functioning reveals a prorated Verbal IQ of 80, Performance IQ of 83, for a Full–Scale IQ of 80 (9th percentile) placing Mr. Wright's current functioning at the lower end of the Low Average Range. However, his intellectual functioning is highly variable and his potential is probably well within the Average Range. In terms of his current functioning he ranges from an extrapolated IQ of 62 (mild mental retardation) on the measure of verbal comprehension and judgment to a high of 114 on a measure of attention, concentration, and short-term memory.

· The absence of a father-figure had an influence on his personality development. The testing indicates that the absence of a father-figure, along with his perception of having very little as a child led him to grow up with unsatisfied needs for dependency, attention, and nurturance.

· His immersion in a dyssocial milieu led him to grow up with the attitudes and

---

11. Defense counsel testified, in pertinent part, as follows:

Q Did you consider hiring an expert, a psychologist or someone who, in a professional capacity, could assist you in developing information about his background and development to possibly develop mitigating evidence?
A I considered it and did nothing about that side of it.

I was absolutely convinced, in talking to [Jermaine], that he had no disability that I could discern that would affect his trial in that his ability—you know, his competence to stand trial or confidence [sic] at the time of the offense, all that was never a consideration. He never gave me any indication of that. Nothing that his family told me indicated that.
Hr'g Tr. at 100–01.

values of that milieu and with little respect for society's rules or for authority.

· Despite the fact that he is clearly streetwise, his personality structure is childlike and immature.

· He has low frustration tolerance and a poor ability to delay gratification.

· When he is emotionally stimulated there is interference with perception, cognition, and control of feelings and behaviors. He responds to his feelings rather than cognitively evaluating situations and the result is poor judgment and impulsive and self-defeating behavior.

· Mr. Wright is easily susceptible to influence by peers, particularly older peers, whose acceptance he would crave.

· In summary, I would make the following diagnoses regarding Mr. Wright: 1. Mixed Personality Disorder (NOS) with Immature, Dyssocial, and Antisocial Features; 2. Drug Dependency, particularly heroin but also multi-drug dependency.

Dr. Cooke further stated in his report that in his opinion "if a psychological evaluation had been conducted at the time of Mr. Wright's trial these diagnoses and personality dynamics would have revealed themselves and could have been presented during the penalty hearing as part of mitigating factors."

The facts of this case are strikingly similar to those in the Seventh Circuit's case of *Brewer v. Aiken,* 7th Cir., 935 F.2d 850 (1991). In *Brewer,* the Seventh Circuit affirmed the Court of Appeals' decision that defense counsel was ineffective during the penalty phase of the trial. The relevant facts of *Brewer* are as follows: The defendant Brewer was convicted of murder and sentenced to death in accordance with the jury's recommendation. During the penalty phase, defense counsel persuaded Brewer to testify denying that he was the one who pulled the trigger at the time of the murder. During cross examination of Brewer; however, the State elicited damaging testimony. Despite this testimony and the fact that defense counsel was aware of psychiatric problems Brewer had as a youth, defense counsel did not question Brewer about his mental history. Defense counsel also did not seek a

psychiatric evaluation of Brewer or attempt to introduce any mitigating evidence to the jury. Before sentencing Brewer to death, the Judge ordered a psychological examination of Brewer to determine his performance I.Q. The report of the psychiatrist revealed, *inter alia,* that Brewer "reaches into the dull-normal range of intelligence," "simply acts on feeling and impulse," "appears to live pretty much on the moment without thinking ahead nor looking much behind," and has "failed to complete the 9th grade in school." The Court held that:

> [D]efense counsel's failure to investigate the mental history of a defendant with low intelligence demonstrates conclusively that he did not "make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors."

*Brewer,* 935 F.2d at 857 *citing Kubat,* 867 F.2d at 369.

 This Court finds the rationale and holding in the *Brewer* case to be persuasive. Wright had recently turned 18 at the time of the Hi–Way Inn robbery/homicide. The youth of a defendant is well-recognized as a mitigating factor. *See Johnson v. Texas,* — U.S. ——, ——, 113 S.Ct. 2658, 2668, 125 L.Ed.2d 290 (1993) (finding that it is undisputed that a defendant's youth is a relevant mitigating factor which must be considered by the jury if a death sentence is to meet constitutional requirements.) Defense counsel knew that Wright was young, poor, of marginal intelligence, and had dropped out of school at an early age. A reasonable investigation of a client with those characteristics should have included a psychiatric evaluation, an investigation of that client's school records, and an investigation into his prior criminal history. Only upon this proper investigation could defense counsel have known what potential mitigating factors were available for Wright's defense. In fact, the investigation which was done post-trial for purposes of this postconviction motion, particularly the psychiatric evaluation, did produce arguably significant mitigating factors. Dr. Cooke's evaluation of defendant indicated several personality traits similar to those

identified in *Brewer* which may have been persuasive to a jury had the jury been made aware of them at the penalty hearing.

▆▆▆▆ The State argues that because the trial Judge obtained a presentence report, and therefore was aware of certain potentially mitigating factors about Wright which the jury was not, the ultimate sentence reflected consideration of these factors and thus there was no prejudice to the defendant. The fact that the sentencing judge ultimately learns of potentially mitigating evidence and considers it in the sentencing decision does not cure the prejudice established by defense counsel's failure to present similar evidence to the sentencing jury. *See Brewer*, 935 F.2d 850. The Court was not aware of the psychiatric testimony until the hearing on the Rule 61 postconviction motion. This Court does not conclude that a cogent, organized presentation of evidence regarding school records, criminal history, and psychological evaluation would not have affected the jury's decision. It is vital in a capital punishment system such as ours, where the jury's decision serves as an important and greatly-weighted recommendation, that the Court's ultimate decision be based on evidence that is substantially similar to the evidence presented to the jury. *See Wright II*, 633 A.2d at 335 ("the Superior Court bears the ultimate responsibility for imposition of the death sentence while the jury acts in an advisory capacity 'as the conscience of the community.'") (citations omitted). Furthermore, the State has not attempted to and cannot show that the sentencing judge would have chosen to disregard the jury's recommendation had it been for life as opposed to death.

▆▆▆▆ Wright further contends that defense counsel had no strategy during the penalty phase and was unaware of the law relating to mitigating circumstances. He argues that because of defense counsel's lack of knowledge and strategy, defense counsel did not adequately present to the jury available evidence in mitigation.

▆▆▆▆ Defense counsel is not required to present mitigation evidence if, after reasonable investigation, counsel believes that the evidence may be more harmful than help-ful. *Griffin v. Wainwright*, 11th Cir., 760 F.2d 1505, 1513 (1985), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1992, 90 L.Ed.2d 672 (1986). Counsel has not acted ineffectively when he or she withholds such evidence when it is more strategic and sound to do so. *Deputy I*, op. at 14; *See also Laws v. Armontrout*, 8th Cir., 834 F.2d 1401 (1987).

▆▆▆ The fundamental basis of these principles is that it is acceptable for defense counsel to choose not to use certain information which, in one sense, may be considered mitigation; however, before deciding not to use such information, defense counsel must have adequately investigated the mitigating evidence available and made a strategic choice not to use it. In the case at hand, defense counsel did not investigate the evidence in mitigation sufficiently to support a contention that he made a strategic choice not to use it.

▆▆▆▆ In addition, defendant urges that defense counsel was deficient because he asked for mercy from the jury. Such a plea is not unusual, nor is it improper. *See Flamer*, 585 A.2d at 757. However, evidence such as a difficult childhood and development deficiencies is essential as a basis for the plea; otherwise, it collides with the Court's instruction not to render a verdict on the basis of sympathy. In this case, there was a brief reference to the hardship of Wright's youth in counsel's closing remarks, along with an attack on the vindictive nature of the death penalty law. A reasonable juror could have considered the brief summation, which lasted less than five minutes, as a mere plea for sympathy.

It is instructive to contrast the facts in this case with other cases where a claim of ineffective assistance of counsel has not been successful. In *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the United States Supreme Court addressed, *inter alia*, defendant's claim of ineffective assistance of counsel for defense counsel's reliance on only a plea for mercy in the penalty phase. The Supreme Court held that defense counsel's plea was a reasonable tactical decision. *Darden*, 477 U.S. at 186, 106 S.Ct. at 2474. In *Darden*, defense coun-

sel made a plea for mercy after a reasonable investigation into mitigating factors which may have been helpful to defendant. Only after he acquired such information did he strategically choose to omit it from his argument because of its potentially harmful impact and decide to rely on the only safe argument available: a plea for mercy. In the case at hand, defense counsel relied on merely a plea for mercy without making that vital preliminary strategic decision.

Defendant's plea for mercy cannot be said to be like that of defense counsel in the Eleventh Circuit case of *Francis v. Dugger*, 11th Cir., 908 F.2d 696 (1990). In *Francis*, defense counsel made a decision at the sentencing hearing to deliver a highly impassioned emotional argument which, rather than focusing on the defendant, emphasized the Easter season, forgiveness, compassion and the value of life. *Id.* at 703. The case arose out of the torture and murder of a confidential informant. The defendant was 31 years old at the time of the crime. The Court held that the failure to present evidence of the defendant's impoverished, abused, and socio-economically limited childhood and alleged brain damage from fetal alcohol syndrome would not be considered ineffective. The Court found that such evidence, when related to a 31–year old man who appreciated the criminality of his conduct and was described as being articulate, with speech which exhibited highly struc-

tured and organized reasoning, would have little or no mitigating weight. Trial counsel was successful before the jury which returned a recommendation of life imprisonment. The sentencing judge overrode the jury's recommendation and sentenced the defendant to death.

Defense counsel's plea for mercy is also unlike that presented by defense counsel in *Deputy v. Taylor*, 3rd Cir., 19 F.3d 1485 (1994) (*Deputy III*). In *Deputy III*, defense counsel's simple plea for mercy was found to be objectively reasonable. The *Deputy III* case is distinguishable because, unlike this case, defense counsel in *Deputy III* had properly investigated mitigating evidence, presented psychiatric reports to the jury through stipulation, and made a strategic decision to focus the jury's attention on how Deputy had been changed by a religious conversion rather than dwelling on his turbulent past. *Deputy III*, 19 F.3d at 1494.

"Rather than considerations of preparation, time or experience, the real test is whether counsel's decision not to introduce readily available mitigating evidence is reasonable in light of counsel's overall strategy." *Strickland*, 466 U.S. at 700, 104 S.Ct. at 2071; *see also Riley I*, Op. at 16. In the case at hand, defense counsel had no perceptible strategy for the penalty phase of the trial. He did not develop evidence regarding psychological development and school history because he did not think it would be helpful.[12] A reasonable evaluation of whether this in-

---

12. Defense counsel testified during the evidentiary hearing, in pertinent part, to the following:

 Q ... Did you consider the possibility that his school records, if they had been obtained, might disclose something about his background?

 A I did not think they would be any help to me.

 Q Even where you have a defendant who is just eighteen when the crime's committed, school history isn't relevant in your opinion?

 A It—in my mind, at that time it was—there was nothing I—I was going to learn from his school records that was going to make any difference in this case. I knew enough from him, from [Jermaine] himself, and his mother to pretty much figure out what his school records were going to show.

 Q You were aware prior to the trial that Jermaine Wright had a history of drug addition. Is that correct?

 A Drug use at least.

 Q Drug use.... You also knew that he was eighteen when this crime was committed.

 A Right.

 Q Right. Did you know anything or look into anything concerning his juvenile criminal record?

 A I know I inquired about it from [Jermaine] and his mother.

 I may have. I don't know. I guess the state may have supplied me with his record. I'm not sure. I may have inquired somehow into it officially, but again it wasn't significant in any way that I could learn from talking to him to a point that I thought it was going to make any difference.

 Q Did you consider the possibility that his Family Court file or records in ... school or some other place where he may have been might contain information of a psychological nature or information, social reports, anything of that like [sic]?

 A I didn't consider that.

 Q Okay. And I take it you didn't look into that?

formation was *helpful or not could not have* been made without knowing what an investigation into that type of evidence might reveal.

The Court must evaluate whether counsel's representation was ineffective by looking at the totality of the circumstances. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *DeShields,* 830 F.Supp. at 824. After viewing the totality of the circumstances surrounding Wright's legal representation during the penalty phase, this Court finds that defense counsel's almost complete lack of investigation into Wright's mental, school, and family history, and, thus, lack of knowledge regarding it, in addition to his lack of strategy in presenting mitigation evidence in the penalty phase, constitutes ineffective assistance of counsel sufficient to undermine confidence in the outcome of the jury's death penalty recommendation. *Brewer,* 935 F.2d at 860. Therefore, defendant has satisfied the prejudice prong of *Strickland. See Id.*

### III.

In conclusion, this Court finds that defense counsel's actions during the guilt phase of defendant's trial were reasonable in light of the circumstances and can be considered sound trial strategy. This Court also finds that defense counsel's representation during the penalty phase of defendant's trial was so unreasonable as to render the recommendation of the jury and this Court's sentence unreliable, thus depriving defendant of his right to a fair trial pursuant to the Sixth Amendment.

Based on the foregoing rationale, defendant Jermaine Wright's Rule 61 motion for postconviction relief is **GRANTED.** Defendant's death sentence is **VACATED.** A new penalty hearing is to be held in accordance with this opinion.

IT IS SO ORDERED.

A I did—did not look into it, no, other than, as I said, I may have seen his record. . . .
Q Okay. But in any event, you didn't take any steps to see if there was—were any records available through Family Court.
A No, I did not.
Q Or through any other agency that might help you shed some light on his background.
A I did not.

Q Did you consider hiring an expert, a psychologist or someone who, in a professional capacity, could assist you in developing information about his background and development to *possibly develop mitigating evidence?*
A I considered it and did nothing about that side of it.
Hr'g Tr. at 98–101.