## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| | ) | |
| v. | ) | I.D. No. 1305011774A |
| | ) | |
| | ) | |
| DARRELL COLEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Submitted: October 2, 2020
Decided: February 12, 2021

*Upon Consideration of the Commissioner's Report and Recommendation on Defendant's Motion for Postconviction Relief*,
**ADOPTED**.

*Upon Consideration of Defendant's Appeal from the Commissioner's Report and Recommendation on Defendant's Motion for Postconviction Relief*,
**DENIED.**

Martin O'Connor, Esquire and Elizabeth McFarlan, Esquire, Deputy Attorneys General, Department of Justice, Wilmington, Delaware. *Attorneys for the State*.

Patrick Collins, Esquire of Collins & Associates, Wilmington, Delaware. *Attorney for Defendant*.

**MEDINILLA, J.**

# I.     INTRODUCTION

Defendant, Darrell[1] Coleman ("Defendant") brings this Motion for Postconviction Relief claiming ineffective assistance of counsel[2] after he was convicted for the murder of Marvin Moore who was shot in the face and chest on Mother's Day in 2013. The killing took place following a series of heated cell phone conversations between Defendant and Moore that culminated in the fatal rendezvous in the Riverside area of Wilmington.

The Court has considered Defendant's Motion, the State's Response,[3] Defendant's Reply,[4] the corresponding Evidentiary Hearings,[5] Post-Hearing Memoranda,[6] the Commissioner's Report and Recommendation,[7] Defendant's Appeal from the Commissioner's Report,[8] the State's Response to Defendant's Appeal,[9] the sentence imposed upon Defendant, and the record in this case. For the

---

[1] Defendant's given name is Darcell but, since indictment, he has been referred to as Darrell.
[2] *See* Defendant's Motion for Postconviction Relief Filed Pro Se, D.I. 94 [hereinafter the Court will refer to docket numbers]; *see also* Defendant's Amended Motion for Postconviction Relief, D.I. 108.
[3] *See* State's Response to Defendant's Amended Motion for Postconviction, D.I. 111.
[4] *See* Defendant's Reply, D.I. 112.
[5] *See* Evidentiary Hearing Held on August 22, 2018 Before Commissioner Manning, D.I. 119; *see also* Evidentiary Hearing Held Before Judge Manning on November 30, 2018, D.I. 122.
[6] *See* Defendant's Post-Hearing Memorandum for Amended Motion for Postconviction Relief, D.I. 124; *see also* State's Response to Defendant's Post-Hearing Memorandum, D.I. 127.
[7] *See* Commissioner's Report and Recommendation, D.I. 128 [hereinafter Comm'r Report].
[8] *See* Defendant's Appeal from Commissioner's Findings of Fact and Recommendation, D.I. 131.
[9] *See* State's Response to Defendant's Appeal of Commissioner's Report and Recommendation, D.I. 135.

1

reasons set forth here, Commissioner Manning's Report and Recommendation are **ADOPTED.** Defendant's Motion for Postconviction Relief is **DENIED**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[10]

Early during the day on May 12, 2013, Moore had spent time with his six-year old son, J.R., who had been visiting Moore as part of a planned visitation, J.R. was scheduled to return to his mother's home that evening.[11] Defendant was then J.R.'s mother's boyfriend and he and Moore had been arranging J.R.'s return.[12] The final arrangement called for Moore to drop off J.R. at a Wawa near Memorial Drive in New Castle.[13]

It is not fully clear exactly what ignited harsh exchanges between the two men that day but what is known is that Moore decided not to show up to the Wawa as the verbal cell phone arguments continued. Instead, Moore's two friends Tierra Battles ("Battles") and Dearius Riley ("Riley") took J.R. to the Wawa while Moore waited at a friend's house nearby.[14]

At the Wawa, J.R. got into Defendant's vehicle with plans that Defendant would drive him back to his mother's house. In the Wawa parking lot, an argument

---

[10] The recitation is from the account of facts found in the Supreme Court of Delaware decision in *Coleman v. State*, 141 A.3d 1037, 2016 WL 3387192, (Del. June 3, 2016) (TABLE).
[11] *Coleman*, 2016 WL 3387192, at *1.
[12] *Id.*
[13] *Id.*
[14] *Id.*

2

ensued between Defendant and Battles when Defendant insisted on knowing why Moore did not show up.[15] Riley tried to defuse the argument and asked if Defendant wanted him to go get Moore but Defendant declined, stating "[i]f [Moore] was a man, [he] would have come down."[16] Despite the continued arguments, J.R. left with Defendant.[17]

After leaving the Wawa, Battles and Riley returned to the friend's house and told Moore about the confrontation with Defendant. Moore responded with "I'm sorry, but I got to go take care of my business" and expressed he was going to meet Defendant "to fight."[18] Riley heard Moore state on the phone "if you want to fight, we could fight; if you want to shoot, we could shoot."[19] Riley told police he believed that Moore was going to his house to get a gun before confronting Defendant but did not know if Moore was really going to get one[20] or if it was just "angry talk."[21] Riley further made a statement to police that he overheard Moore on the phone: "[Moore] is talking about '…I'm about to go to Riverside. He is talking about that he wanted me to meet him at Riverside, so that's where I'm going to go; like f*** him, he's

---

[15] *Coleman*, 2016 WL 3387192, at *1.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] D.I. 131, at 5.
[20] Defendant's Appendix to Amended Motion for Postconviction Relief, D.I. 109, at A335.
[21] *Id.* at A347.

3

dead.'"[22]  Moore and Defendant arranged to meet near Peralta's Market in Riverside.[23]

When Defendant arrived at the agreed-upon location, he backed his vehicle down a one-way street and parked.[24]  As Moore walked across the street from Peralta's Market, Defendant left his vehicle and ran diagonally back across the street between two cars.[25]  Moore was shot.  Defendant then left the scene in his car.  Upon arrival to the scene, police determined that Moore had suffered two gunshot wounds.[26]  He also had a revolver between his thighs.[27]

On May 13, 2013, J.R. was interviewed by the Children's Advocacy Center. He stated that Defendant picked him up at the Wawa and, before taking him to his mother, drove to the Riverside area where he witnessed Defendant shoot Moore.[28] When local law enforcement could not locate Defendant in Delaware, they called upon the U.S. Marshall Service for assistance.  On May 31, 2013, Defendant was apprehended by the U.S. Marshall Service in Newark, New Jersey.[29]

---

[22] D.I. 109, at A347.
[23] *Coleman*, 2016 WL 3387192, at *1.
[24] *Id.*
[25] *Id.* at *2.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*

### A.    *Procedural Background*

A Grand Jury indicted Defendant for Murder First Degree, Possession of a Firearm During the Commission of a Felony ("PFDCF"), and Possession of a Deadly Weapon By a Person Prohibited ("PDWBPP").[30]  During a five-day trial, the State presented overwhelming evidence to support both charges.[31]

Defendant elected not to testify.

On October 27, 2014, the jury returned guilty verdicts against Defendant of Murder in the First Degree and PFDCF.[32]  On February 20, 2015, this Court sentenced Defendant to life imprisonment for Murder First Degree, and three years at Level V for PFDCF.[33]  Defendant appealed the conviction, which the Supreme Court upheld on June 3, 2016.[34]

On July 5, 2016, Defendant filed a timely Motion for Postconviction Relief ("Rule 61").[35]  On July 25, 2017, Defendant, through assistance of appointed counsel, filed an Amended Rule 61 Motion.[36]  Timothy Weiler, Esquire, ("Trial Counsel") filed his Affidavit, responding to Defendant's Rule 61 claims on August

---

[30] Indictment, True Bill Filed No. 128, D.I. 3.  The PDWBPP charge was severed prior to trial.
[31] *See Coleman*, 2016 WL 3387192, at *3 (detailing the overwhelming State's evidence supporting Defendant's conviction.).
[32] D.I. 63.
[33] *See* Sentencing Calendar:  Defendant Sentenced, D.I. 79; *see also* Sentence:  ASOP Order Signed & Filed on 03/03/15.
[34] *See Coleman*, 2016 WL 3387192.
[35] D.I. 94.
[36] D.I. 108.

23, 2017. The State filed its Response on September 22, 2017 and Defendant filed his Reply on October 27, 2017. Defendant's Amended Rule 61 Motion was referred to then-Superior Court Commissioner Bradley Manning ("Commissioner")[37] pursuant to 10 *Del. C.* § 512(b) and Superior Court Criminal Procedure Rule 62(a)(5).

In his Rule 61 Motion, Defendant argued that Trial Counsel was ineffective in two ways. First, Defendant says his counsel failed to properly develop the firearm/toolmark evidence at trial. Second, Defendant faults Trial Counsel for failing to litigate a D.R.E. 609 motion at trial. The Commissioner called an evidentiary hearing under Criminal Rule 61(h) limited to Defendant's first claim regarding firearm/tool mark evidence,[38] principally related to State's ballistic expert, Carl Rone ("Rone").[39] The Commissioner conducted two hearings on August 22, 2018, and November 30, 2018. Although Rone was not called to testify,[40] the Commissioner heard testimony from both Defendant and Trial Counsel.

---

[37] In November 2018, Commissioner Manning was appointed to the Court of Common Pleas. J. Manning was sworn in to CCP during the pendency of this Motion, retained jurisdiction, and issued his Report and Recommendation while sitting by designation in the role of Superior Court Commissioner. For ease of reference and purposes of this ruling only, J. Manning is referred to as Commissioner.

[38] D.I. 113.

[39] Comm'r Report, at 4.

[40] *Id.* at 5 ("Shortly thereafter, it was learned that Rone had been fired by the [DSP] and charged with a number of crimes for falsifying time sheets….Neither side elected to call Rone as a witness, presumably due to the pending legal case against him.").

6

At the first hearing, Defendant admitted for the first time that "he pulled out his own gun and shot Moore…."[41] At the close of the hearings, Defendant and the State filed their respective post-hearing memoranda.[42] On April 23, 2019, the Commissioner issued his Report and Recommendation concluding that Defendant's Rule 61 Motion should be denied.[43]

On June 11, 2019, Defendant appealed the Report arguing that it: (1) mischaracterizes Trial Counsel's relationship with Defendant; (2) misstates the record about the firing pin evidence; (3) improperly holds Defendant's testimony to a beyond reasonable doubt standard; (4) improperly finds that a reasonable probability of a different result does not exist; and (5) improperly finds that Defendant was not prejudiced.[44] Though not addressed in that order, each objection is fully considered below. The State responded seeking to have this Court uphold the Commissioner's findings and recommendation.[45] The matter is now ripe for disposition.

---

[41] Comm'r Report, at 12.

[42] D.I. 124; D.I. 127.

[43] Comm'r Report, at 19.

[44] *See generally* D.I. 131.

[45] D.I. 135. For reasons still not quite clear, that appeal was initially referred to another commissioner who issued a second report and recommendation that Defendant's Rule 61 motion be denied. *See* D.I. 138. Both parties agreed that the second report be vacated. The Court has done so and Defendant's appeal of the Commissioner's Report is considered solely on the basis of Defendant's objections and the State's response to the first. *See* Order Vacating Commissioner Parker's January 21, 2020 Report, D.I. 143.

## III. STANDARD OF REVIEW

### A. *Judicial Review of Commissioner's Report*

Under Rule 62(a)(5), the Commissioner, to which the Court referred this Rule 61 motion, is permitted to conduct hearings and submit proposed findings of fact and recommendations for the disposition of that motion by a judge.[46] The Court "may accept, reject or modify, in whole or in part, the findings of fact or recommendations made by the Commissioner."[47] Having received timely objections to the Commissioner's recommendations, the Court now makes a *de novo* review of "those portions of the report" to which an objection is made.[48]

### B. *Ineffective Assistance of Counsel*

To succeed on his ineffective assistance of counsel claims, Defendant must demonstrate: (1) "that trial counsel's performance was objectively unreasonable"[49] and (2) that if counsel was deficient, that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[50] Mere allegations of ineffectiveness are not enough.[51] Counsel "may not be faulted for reasonable miscalculation or lack of foresight or for failing to

---

[46] DEL. SUPER. CT. CRIM. R. 62(a)(5).
[47] *Id.* 62(a)(5)(ii).
[48] *Id.* 62(a)(5)(iv).
[49] *Sykes v. State*, 147 A.3d 201, 211 (Del. 2015) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).
[50] *Strickland*, 466 U.S. at 694.
[51] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

prepare for what appear to be remote possibilities."[52] There is a strong presumption that a defense counsel's conduct constituted sound trial strategy[53] and Defendant must make and substantiate concrete allegations that overcome this strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.[54] Finally, a reviewing court must "avoid peering through the lens of hindsight."[55]

## IV.   DISCUSSION

### A. Defendant Was Informed of Possible Self-Defense Claim

At the evidentiary hearing before the Commissioner, Defendant explained that he never admitted to Trial Counsel that he shot Moore because he did not feel comfortable doing so.[56] He further claimed that Trial Counsel never discussed the possibility of asserting a self-defense claim.[57] Blaming both lack of trust and communication, he argues that the failure to establish "a relationship of trust"[58] forced Defendant to get advice from prison paralegals,[59] namely that Delaware did not recognize self-defense claims. Conversely, Trial Counsel testified he enjoyed a

---

[52] *State v. Finn,* 2012 WL 1980566, at *4 (Del. Super. May 23, 2012) (citing *Harrington v. Richter,* 562 U.S. 86, 102-110 (2011)).
[53] *Strickland*, 466 U.S. at 694.
[54] *See Salih v. State*, 962 A.2d 257, 2008 WL 4762323, at *1 (Del. Oct. 31, 2008) (TABLE); *see also Albury v. State*, 551 A.2d 53, 59 (Del. 1988).
[55] *State v. Wright,* 653 A.2d 288, 295 (Del. Super. 1994).
[56] D.I. 131, at 3.
[57] Comm'r Report, at 11.
[58] D.I. 131, at 4.
[59] *Id.*

good relationship, and that Defendant had sent him notes complimenting and thanking him for his efforts.[60] But letters to Trial Counsel from Defendant suggested a more strained attorney-client relationship.[61]

Nevertheless, the Commissioner found Defendant's testimony "wholly unconvincing" that the viability of a self-defense claim was never explained to him.[62] He considered evidence that Trial Counsel visited Defendant pre-trial on at least eight occasions,[63] and noted that Trial Counsel logged two video-phone interviews with Defendant and mailed him at least forty items of discovery and/or letters.[64]

Despite the noted communications, Defendant objects to the Report's mischaracterization of the attorney-client relationship, and maintains Trial Counsel was ineffective when he failed to meet with him during the six weeks leading up to trial and, more importantly, during trial, where he did not have mid-trial discussions with Defendant about the facts or his decision not to testify.[65] The assertion of ineffectiveness included "when [Defendant] told [him] that he did not want to testify, [Trial Counsel] did not ask why, ask any questions, or offer any advice."[66] And that as the case was developing at trial (to include, in part, Riley's testimony that he

---

[60] D.I. 131, at 4.
[61] *Id.*; *see also* D.I. 124, at 10.
[62] Comm'r Report, at 5.
[63] *Id.* at 12.
[64] *Id.* at 13.
[65] *Id.* at 6.
[66] D.I. 131, at 6.

believed victim Moore was going to get a gun before he confronted Defendant,) that Trial Counsel failed to "take the opportunity"[67] to do more with the self-defense claim.

No matter how either side might characterize any given meeting or communication, there is no doubt that Trial Counsel adequately informed Defendant of the potential for a self-defense argument. On December 19, 2013, Trial Counsel sent a detailed letter to Defendant explaining how the evidence did not support an "identity" defense and that the State was expecting an assertion of self-defense on Defendant's part.[68] Additionally, contemporaneous notes of Trial Counsel from an August 2014 video-phone meeting with Defendant indicate that Defendant did not want to argue self-defense.[69] Most importantly, six weeks prior to trial, on November 11, 2014, a third letter from Trial Counsel to his client informs Defendant that "[t]he most viable defense to you (although not 100% perfect) is that you acted in self-defense . . . [and] that YOU BELIEVED the use of deadly force was justified because YOU believed [it] was necessary for the purpose of protecting yourself."[70]

The record supports the finding that Defendant chose not to testify, understanding that, while not optimal, this defense could still be raised. Whatever

---

[67] Comm'r Report, at 5.
[68] *Id.*
[69] *Id.*
[70] *Id.* at 5.

the relationship, Trial Counsel repeatedly made known to Defendant that self-defense was available and provided Defendant with case law, including *Guttierrez v. State*[71] to further explain self-defense in Delaware.[72] Defendant, however, refused to admit his involvement in the shooting until after his conviction.[73]

Even assuming the Commissioner had determined the relationship to be a poor one, it cannot be said that Trial Counsel was ineffective because he failed to convince his client to tell the truth or take the stand. The Court disagrees with Defendant's suggestion that Trial Counsel should have had a "come to Jesus" meeting with Defendant during trial.[74] Was Trial Counsel expected to verbally persuade, coax, or wrestle Defendant onto the stand to deliver a narrative he had repeatedly and adamantly denied happened? And to the extent trust had anything to do with Defendant's decision to tell his attorney the truth, there can be no constitutional onus on Trial Counsel to fully establish it.

Trial Counsel made strategic decisions based on what he knew at the time despite Defendant's failures to be truthful.[75] To second guess such strategies is

---

[71] *Guttierrez v. State*, 842 A.2d 650 (Del. 2004).

[72] Comm'r Report, at 13-14.

[73] *Id.* at 14. ("Defendant was 'pretty adamant' that 'he was not present at the crime scene' for most of the representation. However, as trial approached, [Defendant] did finally admit to Trial Counsel that 'he was there [at the crime scene] but didn't shoot anybody.'"). Defendant's Appendix to Post-Hearing Memorandum for Amended Motion for Postconviction Relief, D.I. 125, at A782-83.

[74] D.I. 131, at 5.

[75] *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are

improper.[76]  Trial Counsel presented what supportive evidence he could, requested and received a jury instruction on self-defense, and argued self-defense during his closing argument at trial.[77]  The jury was therefore free to consider and reject a self-defense claim.  Thus, this Court agrees and adopts the Commissioner's findings that Trial Counsel was not ineffective as it relates to pursuing a self-defense argument, nor did the Commissioner mischaracterize the attorney-client relationship.

### B. Defendant's Testimony Weighed Properly

Defendant suggests that the Commissioner improperly held Defendant's testimony to a beyond a reasonable doubt standard.[78]  This Court disagrees.  The Report did not hold Defendant's testimony to an improper standard but rather found that Defendant lacked credibility when recounting his interaction with counsel, his own actions during representation, and the reasons for such.

In order to succeed on his self-defense claim, Defendant says he had to testify at trial.  And he now complains Trial Counsel's inaction prevented him from taking the stand.  More specifically, Defendant argues that Trial Counsel failed to file a

---

usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.").

[76] *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

[77] Comm'r Report, at 14-15.

[78] D.I. 131, at 8.

D.R.E. 609 Motion[79] to obtain a definitive ruling from the trial judge before Defendant elected not to testify. Consequently, he decided not to testify "because he thought if the jury heard about his 2004 drug dealing conviction, they would think he was guilty because they thought he was a felon."[80] And that because Trial Counsel could not conclusively advise him as to the admissibility of the 2004 conviction, he was denied the opportunity to pursue a self-defense claim. He further suggests that this unresolved D.R.E. 609 issue was the sole reason he elected not to take the stand.

The Commissioner appropriately rejected this claim.

First, the Commissioner noted that Defendant's claim of self-defense was remarkably similar to what the prosecution had established at trial.[81] Second, the record did not support Defendant's testimony that he did not receive communication from Trial Counsel regarding a self-defense justification.[82] Third, nothing corroborated Defendant's hearing testimony.[83] Fourth, Defendant never offered testimony during the evidentiary hearing that Moore had actually attempted to fire his gun,[84] making the firing pin evidence far less compelling. The Report did not hold Defendant's testimony to a beyond a reasonable doubt standard; it merely

---

[79] *Id.* at 22.
[80] D.I. 124, at 13.
[81] Comm'r Report, at 11.
[82] *See id.* at 13.
[83] *Id.* at 14.
[84] *Id.*

14

highlighted the many ways the Commissioner found Defendant's testimony to lack credibility in the first instance.

### *C. Knowledge of Firing Pin Evidence Not Misstated*

Defendant now only challenges the Commissioner's findings as to the firing pin evidence, specifically about when Trial Counsel knew that it was available to support a self-defense claim. Before addressing the specific objection, it is noteworthy to elaborate on the firearm/toolmark evidence generally as it speaks to broader arguments made in this Rule 61 motion.

Defendant initially argued Trial Counsel failed to adequately challenge two aspects of the State's ballistics evidence offered at trial through its expert, Rone. These challenges had two parts relating to two weapons—the murder weapon and the revolver found on the victim. We know that Defendant presented two alternative defenses to the jury: he was not the shooter but if he was, the shooting was justified as self-defense. Both theories were argued to the jury. The evidence as to both weapons—as presented at trial—was critical to each defense.

Defendant maintained that he was not the shooter. As to this defense, we know that the murder weapon, the 9mm Smith & Wesson (9mm), was found on the Delaware Memorial Bridge and linked to the five cartridge casings at the scene of the crime. But the two spent bullets (i.e., the actual projectiles recovered in the victim) were mutilated and State's expert Rone could not state the exact caliber of

15

the two recovered bullets due to their damaged condition.[85] He did, however, opine that the two bullets were in the same "class" of family of ammunition that included 9mm, .380, and .357 calibers.[86]

Yet Rone's testimony only went so far as he could not conclude that the bullets recovered from the victim's body were fired from the 9mm handgun, conceding he could not, due to their condition, link them to any gun. As such, Trial Counsel's strategy was to use this evidence to argue, as he did, that there was no evidence that Defendant had actually possessed or fired the 9mm handgun and that of the at least four separate DNA samples recovered from the gun, none matched Defendant.[87] Defendant first claimed in his Rule 61 motion that Trial Counsel could have done more.

He attacked Trial Counsel's failure to challenge Rone by presenting an expert report from Frederick M. Wentling ("Wentling"), a Firearm and Tool Mark Examiner[88] who opined that 1) the bullets recovered from the victim were most likely .38, and therefore could not have been fired from a 9mm; 2) that 9mm bullets are normally metal jacketed but the projectiles recovered from the victim were not; and 3) that the bullets from the victim had been discharged from a heavily worn or

---

[85] Comm'r Report, at 8; D.I. 109, at A412.
[86] Comm'r Report, at 8.
[87] *Id.* at 10.
[88] *Id.* at 9.

oversized barrel, a trait not displayed by the recovered 9mm.[89] In sum, this expert opined the bullets recovered during the autopsy were not fired from the 9mm. Except we know now from Defendant that they were.

Though the proposed expert evidence *could* have helped challenge Rone's testimony at trial, it collapses entirely in light of Defendant's belated version presented at the evidentiary hearing when he admitted for the first time that "he pulled out his own gun and shot Moore…and attempted to toss the gun off the Delaware Memorial Bridge after removing the magazine from the gun."[90] The Commissioner was correct in finding that any attack regarding Rone's ballistic conclusions were rendered moot once Defendant testified and presented a new theory as to why Trial Counsel was ineffective.[91]

This leads us to the remaining challenge as to firearm evidence that relates not to the murder weapon, but rather to the revolver found between Moore's thighs. Here, Defendant shifts from the "I'm not the shooter" theory to the newly fortified self-defense theory. He asserts that Trial Counsel should have elicited testimony from Rone or presented his own firing pin evidence that the revolver found on the victim had at some point in its life misfired three times.[92]

---

[89] Comm'r Report, at 9.
[90] *Id.* at 12.
[91] *Id.* at 11-12.
[92] D.I. 108, at 17.

Yet Defendant's admission that he used the 9mm to shoot Moore succinctly invalidates the first portion of his own expert's opinion (that excludes the 9mm as the murder weapon) thereby undermining the reliability of the remaining aspects of Wentling's conclusions, including that of the firing pin evidence. Defendant cannot pick and choose the portions of the report that are favorable to him. This leaves us with Rone's findings.

Unfortunately, Rone did not testify at the Commissioner's evidentiary hearing to determine what he would have said at trial had he been cross-examined as to the firing pin evidence. In the absence of his testimony, the most that can be said about the firing pin evidence in his report is a mention that the revolver had "indentations on their primers."[93] More importantly, a handwritten notation next to this finding reads "tried to fire?" with the words "indentations" and "primers" underlined.[94] When Trial Counsel was asked if he knew about the firing pin evidence at trial, he testified he could not recall but acknowledged that the handwriting appeared to be his.[95] He further conceded that evidence establishing that the revolver had previously misfired would have helped bolster a self-defense claim.

Defendant claims the Commissioner misstates the record about when Trial Counsel knew about the firing pin marks, giving it too little a mention in the Report's

---

[93] D.I. 131, at 7.
[94] Id.
[95] D.I. 124, at 14.

footnote.[96]  Deserving of weightier consideration, Defendant claims that because Trial Counsel was in possession of Rone's report—in accord with his testimony—he either knew about the marks and failed to elicit testimony or did not know about the marks even though the report was provided to him well in advance of trial; either scenario he claims establishes ineffective assistance of counsel.[97]

For purposes of this *Strickland* examination, the Court will first presume without finding that it was deficient performance to not further challenge Rone to establish that the firing pin evidence was available to support a self-defense claim. But prejudice cannot be established because that evidence only goes so far.

As to the revolver found on Moore, the most that can be established from Wentling's report is that one of the cartridges displayed a light firing pin mark, and a second cartridge displayed two light indent firing pin marks; noted also in Rone's report.[98]  According to this defense expert, these marks evidenced that someone had at some point in time attempted to fire the handgun three times without actually discharging a projectile.[99]  Though this evidence might support a theory that Moore

---

[96] Comm'r Report, at 15 n. 31 ("Based on his testimony during the evidentiary hearing, it is unclear if Trial Counsel was aware of the firing pin mark evidence at the time of the trial.  Trial Counsel testified that he could not recall, but that "if I had, I certainly would have brough it up…..' In any event, three is no doubt that Trial Counsel did not argue it to the jury.").

[97] *See* D.I. 131, at 7-8.

[98] Comm'r Report, at 9.

[99] *Id.*

attempted to fire the weapon during his confrontation with Defendant, Wentling could not opine as to when or why the weapon obtained those markings.[100]

While Defendant exhorts otherwise, the firing pin evidence does not come from a smoking gun. Though perhaps somewhat helpful, this evidence was at best inconclusive as to the timing of when the firing impressions on the unfired handgun were made. Moreover, Defendant's adamant stance that he "was there [at the crime scene] but didn't shoot anybody,"[101] hamstrung Trial Counsel's self-defense argument and he was left to argue reasonable doubt—that no direct evidence existed to connect the found 9mm weapon to Defendant.

The Court agrees with the Commissioner that Defendant's obstinacy prevented the development of a more complete self-defense claim. Assuming Rone would have concurred with Wentling, the Court can hardly find that prejudice in the form of a reasonable probability of a different verdict derives from Trial Counsel's failure to elicit this testimony from Rone.

### D. Insufficient Demonstration of Strickland Prejudice, a Different Result at Trial

To further advance his self-defense theory, Defendant argues that whether a reasonable probability of a different result existed includes not just consideration of better use of the firing pin evidence, but also the evidence as a whole, which should

---

[100] Comm'r Report, at 9.
[101] *Id.* at 14.

have included his own testimony.[102]  The Commissioner properly laid out the *Strickland* standard's definition of a reasonable probability of a different result.  That is a "probability sufficient to undermine confidence in the outcome."[103]

It is true that Trial Counsel was able to elicit testimony from Riley that Moore made statements about shooting or fighting, and believed Moore was going to get a gun before meeting Defendant.  That a revolver was found on Moore certainly corroborates this testimony.  But even if Trial Counsel had made better use of the firing pin evidence, it remained limited as it lacked any reference to when the revolver may have misfired.  Thus, Defendant's testimony of what happened on the night in question was essential to a self-defense argument, as Trial Counsel recognized and had communicated to Defendant.[104]  Yet, Defendant elected not to heed Trial Counsel's advice and claimed that it was Trial Counsel's fault for not obtaining a D.R.E 609 ruling.  And now, faults the Commissioner's conclusions that there was no prejudice by Trial Counsel's failure to file a D.R.E. 609 motion to exclude Defendant's 2004 drug conviction.[105]  He argues that filing of the motion would have likely excluded the conviction such that Defendant would have testified.[106]  This Court disagrees.

---

[102] D.I. 131, at 10.
[103] *Neal v. State*, 80 A.3d 935, 942 (Del. 2013) (internal quotations and citations omitted).
[104] Comm'r Report, at 16.
[105] D.I. 131, at 10.
[106] *Id.*

Had Defendant elected to testify, Trial Counsel would have conferred with the State to reach an agreement on the prior conviction.[107]  If forced to seek a ruling from the Court, and the ruling was unfavorable, he would have argued for a limiting instruction to address the D.R.E 609 impeachment evidence, if needed.[108]  Though the filing of a motion *in limine* may have been the preferred or best practice, the question is whether Trial Counsel's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or common customs.[109]  It did not.

Under Rule 609, Defendant's ten-year old felony conviction[110] provided the Court with the discretion to weigh the conviction's probative value against its potential prejudicial effect.[111]  In other words, there was no guarantee of exclusion. So even if the deficiency had been cured and Trial Counsel had filed a Rule 609 motion to exclude Defendant's conviction, Defendant assumes 1) the Court would have ruled in his favor *and* 2) that Defendant would then have elected to take the stand *and* 3) that he would have testified unequivocally to shooting Moore.  And

---

[107] *See* D.I. 125, at A785.
[108] *Id.* at 786.
[109] *See Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").
[110] D.R.E. 609(b).
[111] *State v. Hunter*, 1994 WL 682618, at *3 (Del. Super. Oct. 21, 1994) (citing *Williams v. State*, 494 A.2d 1237 (Del. 1985)).

22

even assuming twelve jurors would have accepted his testimony as truth to yield a different outcome, these assumptions require supposition and speculation.

First, there is no guarantee that the ruling would have been favorable to Defendant. Defendant supposes the Court would have ruled his conviction inadmissible. With this assumption, he says that then and only then would he have considered testifying. Even if the Court had ruled in his favor, we would need to further accept through speculation that he would not only have taken the stand, but that he would have then relayed to the jury that which he gave only post-conviction—he did shoot Moore.

The Commissioner's Report reflects that Defendant had long held the position that he did not shoot Moore; in fact, up until trial began Defendant consistently told Trial Counsel that he was not even present at the scene.[112] It was only shortly before trial that Defendant admitted he was present.[113] Though there is evidence in the record that Defendant had been planning to testify in his defense, in a letter dated October 13, 2014, Trial Counsel advised Defendant of what he should consider prior to deciding to take the stand.[114] Notably absent from the letter was that Defendant

---

[112] Comm'r Report, at 14.
[113] *Id.*
[114] *Id.* at 18.

had a prior felony conviction.[115]  Despite this, Defendant later changed his mind and decided not to testify.

Nothing in the record indicates Defendant was concerned about his prior conviction before this postconviction appeal.  Finally, it is also notable that Defendant did not make his final decision on whether he would testify until after he had seen the evidence that the State had put forth in its case-in-chief.[116]  And at sentencing, he told the Court (and Moore's family) that he hoped the true shooter would one day be found.[117]  The Court finds it highly unlikely that even if Defendant's prior conviction had been ruled inadmissible prior to trial, that Defendant would have experienced a change of heart or mind and suddenly admitted to Trial Counsel that he shot Moore.

Defendant made his election not to testify.  Trial Counsel did no more than respect the decision.  Even assuming that Trial Counsel should have requested an *in limine* ruling, failure to do so does not lead to a reasonable probability of a different outcome.  Therefore, the Court finds that Defendant suffered no prejudice by Trial Counsel's failure to file a D.R.E 609 motion to exclude Defendant's 2004 drug conviction.

---

[115] Comm'r Report, at 18.

[116] *Id.*

[117] *See* Sentencing Transcript 2/20/2015, at A714 (During Defendant's allocution he stated "I do feel like I've been done unjustly, that I'm not the person who committed this heinous crime….I want to prove to [Moore's family] that…I'm not the person who did this….it's still someone out there…that's the person who committed this crime.").

# V. CONCLUSION

For the foregoing reasons, the Court finds that Defendant fails to meet his burden to demonstrate objective unreasonableness and prejudice as required under *Strickland*. After careful consideration and *de novo* review, the Court accepts and **ADOPTS**, in whole, the Commissioner's Report and Recommendation for the reasons stated above.[118] Defendant's Appeal from the Commissioner's Finding of Fact and Recommendation is **DENIED**.

/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge

oc: Prothonotary
cc: Defendant
     Department of Justice
     Patrick Collins, Esq.

---

[118] *See* DEL. SUPER. CT. CRIM. R. 62(a)(5)(iv) ("A judge may accept, reject, or modify, in whole or in part, the findings of fact or recommendations made by the Commissioner.").