# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
 )
 v. ) ID # 1507018423A & B
 )
GARY PERKINS, )
 )
 Defendant. )

## MEMORANDUM OPINION

Submitted:  August 15, 2023[1]
Decided: November 8, 2023

*Upon Consideration of the Commissioner's Report and Recommendation on Defendant's Motion for Postconviction Relief*,
**ADOPTED**

*Upon Consideration of Defendant's Motion for Postconviction Relief*,
**DENIED**

*Upon Consideration of Rule 61 Counsel's Motion to Withdraw*,
**GRANTED**

*Upon Consideration of Defendant's Motion to Substitute Rule 61 Counsel*,
**DENIED AS MOOT**

Carolyn S. Hake, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State

Patrick J. Collins, Esquire, and Kimberly A. Price, Esquire, Collins & Associates, Wilmington, Delaware, Postconviction Counsel for Defendant Gary Perkins

Anthony A. Figliola, Jr., Esquire, Greto Law, 715 N. Tatnall St., Wilmington, Delaware, Trial Counsel for Defendant Gary Perkins

**JURDEN, P.J.**

---

[1] The matter was reassigned by the President Judge to herself on August 15, 2023.

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  BACKGROUND AND PROCEDURAL HISTORY ....................................2

   A. The Evidence Presented at Trial .....................................................3

      i.    The 911 call .........................................................................3

      ii.   Video evidence......................................................................4

      iii.  Corporal Vice's observations.................................................5

      iv.   DNA, forensic, and blood spatter evidence.............................6

      v.    Perkins' statements to police................................................7

      vi.   Underwood's interview testimony ..........................................8

      vii.  Underwood's trial testimony .................................................9

   B. Postconviction Relief Procedural History .........................................9

   C. Perkins' Rule 61 Claims .................................................................13

   D. Commissioner's Characterization of Perkins' Rule 61 Claims....................15

   E. Perkins' Objections to the Commissioner's Report .....................................16

III. STANDARDS OF REVIEW ...................................................................18

   A. Rule 61: Procedural Bars to Relief ................................................18

   B. Rule 61: Ineffective Assistance of Counsel.....................................20

   C. Rule 61 Counsel's Motion to Withdraw..........................................22

IV.  DISCUSSION .......................................................................................22

   B. Perkins' Objections to the Commissioner's "Relevant Facts" are Without Merit ..................................................................................................23

      i.    The green grocery bag..........................................................24

      ii.   Underwood's testimony.......................................................24

      iii.  Arresting officer's knowledge ..............................................26

      iv.   Perkins' DNA on the McDonald's cup straw...........................27

   C. Ineffective Assistance of Counsel Claims........................................27

      i.    Ground One: Trial Counsel provided Perkins with his chosen defense ..28

      ii.   Ground Two: Trial Counsel's communications were not deficient ........31

*iii.* *Ground Three: Perjury First Degree; and Ground Four: "Prosecutorial Misconduct"* ........................................................................................32

*iv.* *Ground Five: "The Use of False Evidence"* ............................................36

    1. Trial Counsel was not unreasonable when deciding not to test some of Perkins' clothing for DNA ..........................................................36

    2. Trial Counsel was not deficient by failing to obtain a voice expert .....38

    3. There was no suppression issue at the time of the arrest .....................40

  D. Rule 61 Counsel's Motion to Withdraw ........................................................41

  E. Perkins' Motion to Substitute Rule 61 Counsel ...........................................42

V. CONCLUSION ...................................................................................................43

# I. INTRODUCTION

On October 26, 2017, Defendant Gary Perkins ("Perkins") was found guilty by a jury of Murder First Degree and Possession of a Deadly Weapon During the Commission of a Felony for the fatal stabbing of his girlfriend, Jamie Murphy ("Murphy").[2] He now moves for Postconviction Relief under Superior Court Criminal Rule 61 ("Rule 61 Motion").[3] This Memorandum Opinion addresses his Rule 61 Motion, Rule 61 Counsel's Motion to Withdrawal,[4] and Defendant's Motion for Substitute Rule 61 Counsel,[5] encompassing all outstanding motions. For the reasons set forth below, the Commissioner's Report and Recommendation ("Commissioner's Report") is **ADOPTED,** Defendant's Motion for Postconviction Relief is **DENIED,** Rule 61 Counsel's Motion to Withdraw is **GRANTED**, and Defendant's Motion for Substitute Rule 61 Counsel is **DENIED as MOOT**.

---

[2] D.I. 73(A).  Docket numbers followed by the letter (A) refer to the A Case docket and docket numbers followed by the letter (B) refer to the B Case docket.
[3] D.I. 95(A).
[4] D.I. 116(A).
[5] D.I. 150-53(A).

1

## II. BACKGROUND AND PROCEDURAL HISTORY[6]

On the morning of July 23, 2015, Murphy's body was discovered in the playground area of Canby Park,[7] located between the City of Wilmington and Elsmere.[8] Murphy was found partially clothed on top of the slide platform[9] with thirty to forty stab wounds on her face, neck, and chest.[10] The wounds produced such heavy bleeding that blood flowed down the slide and puddled beneath it.[11] The surrounding playground equipment was smeared and spattered with her blood.[12] The cause of death was multiple stab wounds to the neck.[13] Perkins was Murphy's boyfriend at the time of her death.[14] The same day Murphy's body was found, Perkins was arrested in connection with her murder.[15]

On October 26, 2016, Perkins was indicted for Murder First Degree, Possession of a Deadly Weapon During the Commission of a Felony ("PDWDCF"), Possession of a Deadly Weapon by a Person Prohibited ("PDWBPP"), and Criminal Contempt.[16] On January 19, 2017, he filed a motion to sever the PDWBPP and

---

[6] All references to Rule 61 Counsel's Appendix to the Motion to Withdraw are referred to as "C___" and all references to the State's Appendix are referred to as "D___".
[7] C230-33, C236-38, C248-49, C289.
[8] C206.
[9] C248.
[10] C237, C268-7, C438, C448-49.
[11] C237.
[12] C268-71, C278-84, C530-34, C540-41.
[13] C449.
[14] C218.
[15] D.I. 1(A).
[16] D.I. 3(A).

Criminal Contempt charges from the Murder First Degree and PDWDCF charges.[17] The Court granted the motion on May 11, 2017.[18] On October 20, 2017 following a jury trial on the Murder First Degree and PDWDCF charges (the "A Case"), Perkins was found guilty of both charges.[19] After a bench trial conducted the same day, the Court found Perkins guilty of PDWDCF and Criminal Contempt (the "B Case").[20]

### A. The Evidence Presented at Trial

#### i. The 911 call

The State presented overwhelming evidence against Perkins at trial. Most significant was the 911 recording that captured Murphy's murder.[21] This 911 call was made from Murphy's cell phone at 4:01 a.m. on July 23, 2015.[22] As the 911 operator attempted to communicate with the caller, the jury could hear gasping, moaning, and wheezing.[23] The audio captures a male voice stating, among other things; "Die bitch," . . . "I told Jim I was gonna kill your motherfucking ass," and what could be interpreted as, "don't fuck with G."[24] Perkins' Probation Officer

---

[17] D.I. 32(A).
[18] D.I. 47(A).
[19] D.I. 66(A).
[20] D.I. 13(B). These convictions were affirmed by the Supreme Court. *Perkins v. State*, 2019 WL 327959, at *1 (Del. Jan. 23, 2019). Counsel raised only one issue on direct appeal, claiming that an outburst from the gallery during opening statements was so prejudicial that it should have resulted in a mistrial. C786-796.
[21] C173-75.
[22] *Id.*, C366-69, C372-73, C717; D108.
[23] *Id.*
[24] *Id.*

testified at trial that it was Perkins' voice on the 911 call.[25] He testified he was familiar with Perkins' voice as a result of his weekly in-person meetings and phone calls with Perkins over the course of eighteen months.[26]

### ii.    Video evidence

At the scene, law enforcement officers found a purse containing Murphy's photo ID, a green grocery bag,[27] and two McDonald's cups next to her body.[28] The State presented video footage from the McDonald's located in Elsmere near Canby Park that depicted Murphy and Perkins purchasing two drinks on the evening of July 22, 2015 around 7:30 p.m.[29] In the video, Perkins can be seen carrying a green grocery bag similar to the bag found at the scene.[30] Video footage from a second McDonald's on 4th Street in the early morning hours of July 23, 2015 showed Perkins wearing orange sweatpants and speaking to another individual by the name of Thomas Underwood ("Underwood").[31] When Perkins was arrested around 5:30 p.m. on July 23, 2015, he was wearing orange sweatpants.[32]

---

[25] C392-96. The Probation Officer was not identified to the jury as Perkins' Probation Officer.
[26] *Id*.
[27] C267-68, C287-89.
[28] C275-78, C291-92, C573.
[29] C298-03, C573-75.
[30] C298-301; D5.
[31] C314, C577; D7. Because there are two McDonald's, the McDonald's near Elsmere will be referred to as "Elsmere McDonald's" and the McDonald's on 4th Street will be referred to as the "4th Street McDonald's."
[32] C206-07, C351-54.

4

### iii. *Corporal Vice's observations*

Corporal Vice testified he saw Perkins wearing bright orange sweatpants on the morning of July 23, 2015.[33] Corporal Vice knew Perkins from prior encounters and was familiar with Murphy's and Perkins' relationship.[34] Corporal Vice testified that on the morning of Perkins' arrest he saw Perkins on Walnut Street between 8th Street and 9th Street but made no contact.[35] Later that day, following a police call notifying him that Perkins was a suspect in Murphy's death, Corporal Vice located and approached Perkins at a local bus shelter.[36] While patting Perkins down, Corporal Vice noticed that Perkins wore a pair of blue sweatpants underneath his orange sweatpants.[37] After pulling the orange sweatpants partially down, Corporal Vice noticed Perkins' blue sweatpants were covered in blood.[38] Inside the pocket of the blue sweatpants, Corporal Vice found a pen knife and fresh blood.[39] Corporal Vice testified that law enforcement collected Perkins' clothing.[40] The inventory taken included a surfboard keychain attached to a small knife with a two-inch

---

[33] C350. Corporal Vice's full title is Corporal Damian Vice of the Wilmington Police Department. C346-47.
[34] C347-48, C355.
[35] C350, C355.
[36] C350-52, C356-57.
[37] C352-53.
[38] C353. At trial, the State's DNA expert testified it was Murphy's blood.
[39] *Id.*
[40] C361.

blade.[41] Both the keychain and knife appeared to have dried blood on them.[42] Blood was also found on the Perkins' gray long-sleeved shirt, blue short-sleeved shirt, and Timberland boots.[43]

    *iv.   DNA, forensic, and blood spatter evidence*

The State introduced DNA evidence through its DNA expert, Sarah Lindauer ("Lindauer"). Lindauer explained that Perkins' clothing and knife, and the McDonald's cups, among other items, were collected from the crime scene and tested for DNA.[44] The tests revealed that one of the McDonald's cups had Murphy's fingerprints and DNA on it.[45] The other cup had Murphy's DNA on the cup stain and Perkins' DNA on the straw.[46] Blood from Perkins' gray long-sleeved shirt produced a mixed DNA profile of at least two individuals which included Murphy.[47] Blood from Perkins' blue sweatpants and left boot also produced mixed DNA profiles of at least two individuals with Murphy being the major contributor.[48] Blood on the blade of the knife taken from Perkins' pocket at the time of his arrest and blood found on one of his boots produced a single source profile that was consistent

---

[41] *Id.*
[42] C361-62, C401, C414-15, C577.
[43] C405-11.
[44] C474-75.
[45] C482.
[46] C482-83.
[47] C485-89.
[48] *Id.*

with Murphy's DNA.[49] The knife handle swab produced a mixed DNA profile with Perkins as a possible contributor.[50]

The State's forensics expert, Dr. Gary Collins, testified that the cause of Murphy's death was multiple stab wounds to her neck caused by a sharp object consistent with the knife found on Perkins at the time of his arrest.[51]

The State's bloodstain pattern expert, Paul Kish ("Kish"), who performed a pattern analysis on the physical evidence and looked for blood-like stains,[52] testified that the blood spatter observed on the playground equipment and Perkins' clothing correlated with the DNA report.[53] He also testified that the blood spatter patterns on Perkins' sweatpants indicated he was near Murphy when the stabbing occurred.[54]

> v. *Perkins' statements to police*

Detective Bucksner testified that, after being read his Miranda rights, Perkins agreed to speak with the police.[55] Initially, Perkins denied seeing or speaking with Murphy for several weeks, but when confronted with information regarding the McDonald's video footage of him with Murphy, he admitted to seeing her the

---

[49] C478-81.
[50] C484.
[51] C437, C449-54.
[52] C523-24.
[53] C528-47.
[54] C556-57.
[55] C133-C581. Detective Bucksner's full title is Detective Corporal Joseph Bucksner of the Wilmington Police Department. C34-35.

evening of her murder.[56]  Perkins claimed that he and Murphy parted ways after leaving McDonald's, and he spent the night in the 10th Street Park.[57]  He told the police that he developed a rash after having sex with Murphy one week prior to her death and presented to Christiana Hospital to be tested for a venereal disease.[58] Medical records confirmed that Perkins was examined on July 21, 2015 for a sexually transmitted disease.[59]

### vi.    Underwood's interview testimony

Prior to trial, police interviewed Underwood, and Underwood provided incriminating information about Perkins.  Underwood testified in his interview that Perkins was angry with Murphy because he believed she had given him a venereal disease.[60] In his interview, Underwood claimed Perkins said he was going to "beat her up" for giving him a venereal disease.[61]  During cross-examination, defense counsel, Anthony Figliola, Esq. ("Figliola"), vigorously attacked Underwood's credibility, using his prior statement to impeach him before the jury.[62]

---

[56] C139-45, C158, C160.
[57] C146, C161.
[58] C136, C150-54, C160.
[59] C583-84.
[60] C311-14.
[61] C312-13, C317, C320-23.
[62] *Id.*

### vii. Underwood's trial testimony

At trial, Underwood testified that he spoke to Perkins (who he referred to as "G") the day before Murphy was killed.[63] Underwood testified he saw Perkins again on the morning of July 23, 2015 at the 4th Street McDonald's.[64] At the 4th Street McDonald's, Perkins admitted to Underwood that he had seen Murphy the night before on the bus.[65] During that conversation, Underwood observed blood stains between Perkins' finger and thumb. Underwood testified that Perkins always carried a pocketknife.[66]

### B. Postconviction Relief Procedural History[67]

On March 12, 2019, Defendant filed a Motion for Postconviction Relief and the Appointment of Counsel.[68] His Motion was referred to a Superior Court

---

[63] C311-14.

[64] C311-13, C576. Underwood met Perkins through a mutual friend named Ellis Whiteman, who is known as "Jimmy." C310.

[65] C312.

[66] C311-12, C331-32, C576.

[67] This case has a long, drawn out, post-conviction procedural history. This is attributable, in part, to the deluge of letters filed by Perkins. Since filing his Motion for Postconviction Relief in March 2019, Perkins has filed 35 letters. D.I. 97(A), D.I. 103-04(A), D.I. 106-08(A), D.I. 110-13(A), D.I. 119-20(A), D.I. 131(A), D.I. 133(A), D.I. 135-37(A), D.I. 146(A), D.I. 148(A), D.I. 152-53(A), D.I. 155-56(A), D.I. 163(A), D.I. 165(A), D.I. 170-73(A), D.I. 176(A), D.I. 179(A), D.I. 182(A), D.I. 184(A), D.I. 185(A), D.I. 187(A).

[68] D.I. 90-91(A). The State in its Response concisely framed Perkins' initial Rule 61 claims as follows:

> (1) ineffective assistance of counsel for (a) failing to prepare a defense at trial, (b) mailing him discovery 18 days before the trial started, (c) refusing to communicate; (2) "perjury in the first degree" by an unnamed State witness; (3) prosecutorial misconduct for "misleading the jury with untruthfulness"; (4) "the use of false evidence"; (5) failure of the police to inform him of his right to remain silent; (6) Trial Counsel violated Delaware Rules of Professional Conduct 1.4(a)(4) by failing to promptly comply with reasonable requests for legal information he needed.

Commissioner for proposed findings of fact and recommendations pursuant to 10 *Del. C.* § 512(b) and Superior Court Criminal Procedure Rule 62(a)(5).[69]

Two months later, on May 6, 2019, Perkins filed a second *pro se* Motion for Postconviction Relief, raising nearly identical claims as those in his first Motion, and again requesting the appointment of counsel.[70] On June 20, 2019, the Commissioner granted his appointment of counsel request and Patrick J. Collins, Esq. and Kimberly A. Price, Esq. became Perkins' Rule 61 Counsel ("Rule 61 Counsel").[71]

On February 19, 2021, Perkins' Rule 61 Counsel found no meritorious grounds for relief and moved to withdraw.[72] Perkins requested a continuance on March 3, 2021 to respond to his Rule 61 Counsel's Motion, and the Commissioner granted his request.[73]

On April 21, 2021, Perkins filed a Motion for Substitute Rule 61 Counsel and an extension of time to respond to Rule 61 Counsel's Motion to Withdraw.[74] The

---

State's Resp. at 3.

[69] D.I. 94(A).

[70] D.I. 95-96(A). The Court considers Perkins' second *pro se* motion as a supplement to his original Rule 61 Motion.

[71] D.I. 98(A).

[72] *Id.*

[73] D.I. 119-121(A).

[74] D.I. 126-127(A). Although Perkins does not describe his request for substitute counsel as a Motion, the Court will review it, and his corresponding supplemental letters, as such.

Commissioner granted a 30-day extension,[75] and on June 15, 2021, Perkins filed

*pro se* his responses to Rule 61's Counsel's Motion to Withdraw.[76]

On July 27, 2021, Perkins' Trial and Appellate Counsel, Anthony Figliola, Jr., responded to Perkins' claims of ineffective assistance of counsel ("IAC").[77]

In August 2021, Perkins filed a series of supplemental letters and documentation to support his previously filed responses to his Rule 61 Counsel's Motion to Withdraw.[78]

On August 27, 2021, the State filed its response to Rule 61 Counsel's Motion to Withdraw and Perkins' Rule 61 Motion.[79]

On December 10, 2021, the record was further expanded to allow his original Trial Counsel, who withdrew prior to the case going to trial, Eugene Maurer, Jr., Esq., to file an affidavit in response to Perkins' Rule 61 Motion.[80]

Throughout early 2022, Perkins continued to file various submissions with the Court, including letter requests for extensions of time to file his reply, a stay of all

---

[75] D.I. 127(A).

[76] D.I. 128(A). In Perkins' responses, he further clarifies that the witnesses he asserts submitted false claims were both Detective Bucksner and Underwood.

[77] D.I. 130(A).

[78] D.I. 131(A), 133(A), 135-37(A).

[79] D.I. 138-39(A).

[80] D.I. 143-44(A). Maurer served as counsel for Perkins until the Court granted his motion to withdraw on January 23, 2017. *See* D.I. 36(A). The State was permitted to supplement its response to Rule 61 Counsel's Motion to Withdraw and Perkins' IAC claims after Mauer filed his affidavit responding to the IAC claims. However, Maurer's affidavit did not prompt any further briefing by the State. By letter dated January 5, 2022, the State indicated it was relying on its Response to Perkins' Pro Se Motion for Postconviction Relief filed on August 27, 2021. D.I. 145(A).

proceedings, an evidentiary hearing request, and additional requests for the appointment of substitute Rule 61 counsel.[81] In response to Perkins' request to stay the proceedings, the Commissioner granted his request and stayed the matter until November 30, 2022, to give him time to retain substitute Rule 61 counsel.[82] He was unsuccessful in retaining substitute counsel and, on November 23, 2022, he filed his *pro se* brief in support of his Motion for Postconviction Relief.[83]

On March 24, 2023, the Commissioner issued her Report and Recommendation to the Court to deny Defendant's Motion for Postconviction Relief and grant Rule 61 Counsel's Motion to Withdraw.[84] The Commissioner also denied "all other motions related to the Rule 61 motion filed by [Perkins] not previously ruled upon by the Court."[85]

On April 5, 2023, Perkins filed his "Appeal from the Commissioner's Findings of Fact and Recommendation" ("Objections").[86]

---

[81] D.I. 148-50(A), 152-57(A).

[82] D.I. 161(A).

[83] D.I. 169(A). Perkins then filed requests for a decision on December 16, 2022 and December 19, 2022, respectively. D.I. 170-173(A). There are errors in the docket. First, D.I. 169 is filed as Perkins' "Motion for Postconviction Relief." This is not a second motion, but rather is his "Brief in Support of his Motion for Postconviction Relief." The Commissioner's Report refers to a D.I. 168(A) but there is no D.I. 168(A) in the docket.

[84] Commissioner's Report and Recommendation, ID No. 1507018423 A&B, D.I.174(A) (Del. Super. Mar. 23, 2023) (herein "Comm. Rep.").

[85] D.I. 177(A). *See* Comm. Rep. at 21 n.102.

[86] D.I. 177(A). Although Perkins refers to his response as an "appeal," the Court will refer to them as objections consistent with 10 *Del. C.* § 512(b)(1)d.

On May 24, 2023, the Court granted the State's request for an extension of time to respond to Perkins' Objections.[87]

On June 2, 2023, Perkins filed a letter objecting to his Rule 61 Counsel's "decision not to oppose the State's [request for an] extension" because he "was not in agreement with that decision . . . ." [88]

On June 16, 2023, the State filed its Response to Defendant's Objections ("State's Response").[89]

On July 17, 2023 and July 27, 2023, Perkins filed requests seeking a decision on his Objections.[90]

On August 24, 2023, Perkins filed a letter asking whether a decision had been made, again requesting to substitute Rule 61 Counsel, and requesting "docket sheets."[91] The Court provided Perkins with a copy of the case docket on September 15, 2023 and considers his Rule 61 Motion and Motion for Substitute Rule 61 Counsel below.[92]

C.    Perkins' Rule 61 Claims

Consolidating all of Perkins' Rule 61 filings, Perkins asserts the following Rule 61 claims:

---

[87] D.I. 181(A).
[88] D.I. 182(A).
[89] D.I. 183(A).
[90] D.I. 184(A).
[91] D.I. 187(A).
[92] D.I. 188(A).

(1) "Trial Counsel failed to present a defense, failed to provide him with discovery until 18 days before trial, and failed to communicate with him[;]

(2) 'Perjury in the First Degree,' namely that State witnesses provided false testimony in the court proceedings[;]

(3) Prosecutorial misconduct that the State mislead the jury and was untruthful during trial[;]

(4) 'Use of False Evidence,' that because some of his clothing was never tested for DNA that the use of that clothing by the forensic consultant in his testimony was tantamount to providing false evidence[;]

(5) Violation of his *Miranda* Rights in that law enforcement essentially failed to fully explain either his right to remain silent or his right to counsel[;]

(6) A violation of the Rules of Professional Conduct and that his Trial Counsel violated Section 1.4(a)(4) of the Delaware Rules of Professional Responsibility for failing to promptly respond to his requests for legal information before trial and during his direct appeal.

(7) failing to impeach or otherwise object to the testimony of certain police officers at trial;

(8) failing to file a motion to suppress the clothing he was wearing that was not tested for DNA and/or failing to present evidence that some of the clothing he was wearing was not tested for DNA;

(9) failing to call a voice authentication expert to testify that the voice on the 911 call was not Perkins' voice;

(10) failing to cross-examine the officer who testified regarding the 911 call with a transcript of the call 'allowing the jury to see that there was inconsistency with his statement;'

(11) failing to object to the testimony of Thomas Underwood;

(12) failing to refute the statements about the Perkins having a venereal disease; and

14

(13) failing to move to suppress evidence taken from Perkins at the time of his arrest because Perkins was taken into custody [and searched] without a warrant in violation of his Fourth and Fourteenth Amendment rights."[93]

### D.    Commissioner's Characterization of Perkins' Rule 61 Claims

As the Commissioner notes, in Perkins' November 15, 2022 *pro se* Brief in Support of Motion for Postconviction Relief he seems to abandon certain claims and attempts to whittle down the foregoing list into five claims:

Claim One – Petitioner's rights under the United States and Delaware Constitutions were violated by Trial Counsel's failure to investigate, failure to move to suppress and present evidence of Detective Bucksner['s] false statements made during Petitioner's August 26, 2015 preliminary hearing;

Claim Two – Petitioner was deprived of a fair trial because the State knowing[ly] presented and/or failed to correct false testimony at his trial; to the extent Trial Counsel could have objected and presented evidence of prosecutorial misconduct an[d] perjury in the first degree;

Claim Three – Petitioner's rights under the United States and Delaware Constitutions were violated by Trial Counsel's failure to investigate and arrange for a voice expert to attend Petitioner's trial allowing the use of false evidence to be presented;

Claim Four – Petitioner's rights under the United States and Delaware Constitutions were violated by Trial Counsel's failure to object to Thomas Underwood['s] testimony and failure to request a self-serving instruction where State's witness had offenses that were never explored; and

Claim Five – The cumulative effect of two or more of the above-described violations of Petitioner's rights deprived Petitioner of a fair

---

[93] D.I. 167(A), 169(A).

15

trial and, thus, due process of law under the United States and Delaware Constitutions.[94]

E.  Perkins' Objections to the Commissioner's Report

Perkins objects to the following:

(1) Commissioner's finding that the green bag carried by Perkins in the surveillance footage from the McDonald's near Canby Park was consistent with the green bag found near Murphy's body at the scene.[95]

(2) Commissioner's classification that Underwood testified on stand that if Murphy gave Perkins a venereal disease that he would beat up or kill her.[96]

(3) Commissioner's finding, "when the officer learned that Perkins was a suspect in the death of Ms. Murphy, he located Perkins at a bus shelter at the intersection of 10th and King Streets."[97]

(4) Commissioner's finding, "[o]ne of the McDonald's cups found on the playground had Ms. Murphy's fingerprints and DNA on it and the other cup had Ms. Murphy's and the Defendant's DNA on it."[98]

(5) Commissioner's organizing of Perkins' postconviction relief request, placing prosecutorial misconduct and perjury in the first degree under an ineffective assistance of counsel claim.[99]

(6) Commissioner's categorization that Perkins chose the defense that Trial Counsel presented at trial.[100]

---

[94] D.I. 169(A) (i), (ii).
[95] Comm. Rep.
[96] *Id*. at 6-7.
[97] *Id*. at 7.
[98] *Id*. at 9.
[99] *Id*. at 21.
[100] Comm. Rep. at 24.

(7) Commissioner's determination that Trial Counsel was not ineffective for not producing Perkins' laboratory tests to refute statements of him having a venereal disease.[101]

(8) Commissioner's contention that Trial Counsel communicated with Perkins through in-person meetings to review the evidence on numerous occasions.

(9) Commissioner's statement that "[n]othing in the record indicates Detective Bucksner intentionally lied at any stage of the proceedings."[102]

(10) Commissioner's explanation that the inconsistencies in Underwood and Detective Bucksner's comments "do not establish perjury but are rather credibility questions for the jury."[103]

(11) Commissioner's conclusion, "Perkins' 'use of false evidence' assertion is procedurally barred under Rule 61(i)(3) because he failed to raise it in the proceedings leading to his conviction and, as such, should be summarily denied."[104]

(12) Commissioner's finding that Trial Counsel was not deficient because they failed "to present evidence that some of his clothing was not tested for DNA."[105]

(13) Commissioner's finding that Trial Counsel was not deficient in failing to obtain a voice expert to refute Perkins' Probation Officer's testimony.[106]

(14) Commissioner's finding that the police had probable cause to arrest and search Perkins without a warrant.[107]

---

[101] Comm. Rep. at 43-44.
[102] *Id*. at 30.
[103] *Id*. at 31.
[104] *Id*. at 33.
[105] *Id*. at 36.
[106] *Id*. at 38-39.
[107] *Id*. at 47.

## III. STANDARDS OF REVIEW

Pursuant to 10 *Del. C.* § 512(b)(1), the Court may designate a commissioner to review a motion for postconviction relief and provide a report and corresponding recommendation to the Court.[108] Following the issuance of a report and recommendation, any party may file timely objections to the Commissioner's findings.[109] In reviewing a party's objections, the Court "shall make a *de novo* determination of those portions of the report or specified findings of fact or recommendations to which an objection is made."[110] The Court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the Commissioner."[111]

### A. Rule 61: Procedural Bars to Relief

Rule 61 governs postconviction relief.[112] Under Rule 61, an incarcerated individual may seek abrogation of his conviction by establishing a lack of jurisdiction or alternative ground that sufficiently establishes a factual and legal basis for a collateral attack upon the conviction.[113] The rule is designed as a safeguard to allow the Court to correct constitutional infirmities in a conviction or

---

[108] 10 *Del. C.* § 512(b)(1)b.
[109] 10 *Del. C.* § 512(b)(1)d.
[110] *Id.*; *State v. Bartell*, 2020 WL 6480845, at *1 (Del. Super. Nov. 4, 2020).
[111] *Id.*
[112] Super. Ct. Crim. R. 61(a)(1).
[113] *Id.*

sentence.[114]   However, while "Rule 61 is intended to correct errors in the trial process, [it does] not allow defendants unlimited opportunities to relitigate their convictions."[115]

Before considering the merits of any claims for postconviction relief, the Court must first consider whether any procedural bars exist.[116] Rule 61(i) establishes four procedural bars to postconviction relief.[117] Rule 61(i)(1) requires a motion for postconviction relief must be filed within one year of a final judgement or conviction.[118] Rule 61(i)(2) bars successive motions for postconviction relief unless certain conditions are met.[119] Pursuant to Rule 61(i)(3) and (4), any ground for relief not previously raised is deemed waived and any claims formerly adjudicated are thereafter barred.[120]

There is an exception to the Rule 61(i)(3) procedural bar to relief. Procedural default may be overcome if the movant shows "(A) cause for relief from the

---

[114] *Harris v. State*, 410 A.2d 500 (Del. 1970).
[115] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).
[116] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).
[117] Super. Ct. Crim. R. 61(i)(1)-(4).
[118] Super. Ct. Crim. R. 61(i)(1).
[119] Rule 61(i)(2) bars successive or subsequent motions for postconviction relief unless the movant is able to "pled with particularity" that (i) "new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted" or (ii) "a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid." Super. Ct. Crim. R. 61(d)(2).
[120] This includes proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding. *See* Super. Ct. Crim. R. 61(i)(5), (d)(2)(i), (ii).

19

procedural default and (B) prejudice from violation of the movant's rights."[121] A "cause" for procedural default can be shown through IAC.[122] However, "[a]ttorney error short of ineffective assistance of counsel does not constitute 'cause' for a procedural default even when that default occurs on appeal rather than trial."[123] Because IAC claims cannot be raised at any earlier stage in the proceedings and are properly presented by way of a motion for postconviction relief.[124]

B.    Rule 61: Ineffective Assistance of Counsel

To succeed on IAC claims, a defendant must meet the test set out in *Strickland v. Washington*.[125] That is, the defendant must demonstrate that: (1) trial counsel's performance was objectively unreasonable,[126] and (2) if counsel was deficient, there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[127]

Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's conduct fell within a wide range of reasonably professional assistance.[128] Mere allegations of ineffectiveness are not

---

[121] Super. Ct. Crim. R. 61(i)(3)A, B.
[122] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).
[123] *Id*.
[124] *Sabb v. State*, 2021 WL 2229631, at *1 (Del. May 28, 2021); *Green v. State*, 238 A.3d 160, 187-188 (Del. 2020); *Whittle v. State*, 2016 WL 2585904, at *3 (Del. Apr. 28, 2016); *State v. Evan-Mayes*, 2016 WL 4502303, at *2 (Del. Super. Aug. 25, 2016).
[125] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).
[126] *Sykes v. State*, 147 A.3d 201, 211 (Del. 2015) (citing *Strickland*, 466 U.S. at 694).
[127] *Strickland*, 466 U.S. at 694.
[128] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988); *Salih v. State*, 2008 WL 4762323, at *1 (Del. 2008).

enough.[129]  Counsel "may not be faulted for reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."[130] There is a strong presumption that a defense counsel's conduct constituted sound trial strategy,[131] and a defendant must make and substantiate concrete allegations that overcome this presumption.[132]  When reviewing a defendant's allegations of deficient counsel, the reviewing court must "avoid peering through the lens of hindsight."[133]  The "[b]enchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[134]

The Court also utilizes the *Strickland* test when reviewing the performance of appellate counsel.[135]  Importantly, appellate counsel has wide discretion to decide which issues to appeal and is not constitutionally required to raise all possible issues.[136]  "A defendant can only show that his appellate counsel ineffectively represented him where the attorney omits issues that are clearly stronger than those the attorney presented" on appeal.[137]  Even where a defendant is successful in

---

[129] *Younger*, 580 A.2d at 556.
[130] *State v. Finn,* 2012 WL 1980566, at *4 (Del. Super. May 23, 2012) (citing *Harrington v. Richter,* 562 U.S. 86, 102-110 (2011)).
[131] *Strickland*, 466 U.S. at 694.
[132] *See Salih*, 962 A.2d at 257; *see also Albury*, 551 A.2d at 59.
[133] *State v. Wright,* 653 A.2d 288, 295 (Del. Super. 1994).
[134] *Cooke v. State*, 977 A.2d 803, 840 (Del. 2009) (internal quotations omitted).
[135] *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990).
[136] *Neal v. State*, 80 A.3d 938, 946 (Del. 2013).
[137] *Ploof*, 75 A.3d at 832.

demonstrating the foregoing, he must then establish a reasonable probability that, but for appellate counsel's failure to raise the issue, the defendant would have prevailed on appeal.[138]

### C. Rule 61 Counsel's Motion to Withdraw

Rule 61 Counsel's Motion to Withdraw is governed by Superior Court Criminal Rule 61(e)(7). Under Rule 61, counsel may move to withdraw if they find the movant's claim to be "so lacking in merit that counsel cannot ethically advocate it, and counsel is not aware of any other substantial ground for relief available to the movant."[139] When evaluating a motion to withdraw, the Court must determine if its satisfied that moving counsel made conscientious examinations of the record and the law for any claims that could arguably support the Rule 61 motion.[140] The Court should also undertake its own review of the relevant claims to determine whether the Rule 61 motion would be devoid of "any, at least, arguable postconviction claims."[141]

## IV. DISCUSSION

In her forty-nine-page Report and Recommendation detailing why Perkins fails to establish he is entitled to postconviction relief, the Commissioner concludes:

---

[138] *Neal*, 80 A.3d. at 947.
[139] Super. Ct. Crim. R. 61(e)(7).
[140] *State v. Coston*, 2017 WL 6054944, at *2 (Del. Super. Dec. 7, 2017).
[141] *Id*.

22

[t]he evidence presented at trial implicating Perkins in the death of Jaime Murphy was overwhelming. It included, among other things, (i) an audiotape of the 911 call made from the victim's phone during the attack. . . in which her killer's voice is heard and then identified as being Perkins' voice at trial, (ii) surveillance video of the victim and the Defendant together the evening before she was killed, (iii) DNA evidence of the victim found on the murder weapon and Perkins' clothes and (iv) witness testimony implicating Perkins in the crime and establishing motive. The Court finds no professional errors on the part of trial or appellate counsel much less any errors that would meet the exacting standards set forth in *Strickland* or otherwise convince the Court that the trial cannot be relied on as having produced a just result. . . Perkins has failed to establish that either his appellate counsel or Trial Counsel was deficient in any regard or that he suffered actual prejudice as a result thereof. The Court has reviewed the record carefully and has concluded that Defendant's Rule 61 motion is without merit and devoid of any other substantial claims for relief. The Court is also satisfied that appointed Rule 61 counsel made a conscientious effort to examine the record and the law and has properly determined that Perkins does not have a meritorious claim to be raised in his Rule 61 motion.[142]

The Court now addresses each of Perkins' Objections to the Commissioner's Report.

### B. Perkins' Objections to the Commissioner's "Relevant Facts" are Without Merit

Perkins first objects to the following factual findings made by the Commissioner: (1) the green grocery bag found at the murder scene was consistent with the grocery bag Perkins carried in the McDonald's video; (2) Perkins told Underwood that if Murphy had given him a venereal disease that he was going to kill her; (3) the arresting officer knew he was a suspect in Murphy's death before he

---

[142] Comm. Rep. at 48-49.

took Perkins into custody; and (4) Perkins' DNA was on one of the McDonald's cups.[143]

### i.    The green grocery bag

Perkins' objection to the Commissioner's finding that the green bag at the scene was "consistent" with the bag he was carrying as depicted in the video evidence is based on Detective Bucksner's 2015 preliminary hearing testimony that "there were no fingerprints found at the scene that belong to Perkins."[144]   This objection is without merit.  The Commissioner's Report relies on the undisputed evidence presented at trial.  Investigators found a green grocery bag and a black purse at the top of the sliding board where Murphy's body was found.[145]   The surveillance video from the Elsmere McDonald's shows Perkins and Murphy on the evening before the murder and Perkins is carrying a green grocery bag.[146]   This is ample evidence to support the Commissioner's finding.

### ii.    Underwood's testimony

Perkins next argues that Underwood lied in his trial testimony.  He contends that, in Underwood's interview with Detective Bucksner, Detective Bucksner asked whether Perkins said he was going to beat up Murphy and Underwood responded,

---

[143] C482-83.
[144] Objections at 1.
[145] C267-68, C287-89.
[146] C298-303; D5.

24

"No."[147] Perkins overlooks the fact that Detective Bucksner asked Underwood *two* questions: "Did he say he was going to beat her up? Did he say anything else?" to which Underwood answered, "No."[148] Underwood's "No" was in response to Detective Bucksner's second question, not his first. Underwood had already told Detective Bucksner earlier in the interview that "[Perkins], like he, you know, he say to get to her, he'd beat her up."[149] When Detective Bucksner asked for clarification as to why Perkins said he would beat up Murphy, Underwood replied, "because he thought she gave him a venereal disease."[150] The inconsistency between Underwood's trial testimony—that Perkins said he was going to "kill" Murphy and Underwood's police interview—that Perkins said he was going to "beat her up"— was highlighted and explored by Perkins' Trial Counsel in front of the jury.[151] On cross-examination, pursuant to 11 *Del. C.* §3507, Perkins' Trial Counsel introduced Underwood's prior inconsistent statement made to police to impeach Underwood's credibility.[152] When Trial Counsel pointed out to Underwood that there was no mention of Perkins saying he was going to kill Murphy in the Underwood's interview with police, Underwood testified:

> [n]o, that's not true. You only reading two pages of a statement, man. I told [Detective Bucksner] that. He said that day I remember telling

---

[147] Objections at 3-4.
[148] D44.
[149] D43.
[150] *Id.*
[151] C312-13, C317, C322.
[152] C324-325.

him because he said he was going to kill her. . . Why it ain't in the transcript, I don't know. I know I told him that because that man said that.[153]

Trial Counsel then called Detective Bucksner as an adverse witness in the defense's case.[154] During the State's cross-examination questioning when the State asked whether Detective Bucksner remembered Underwood talking about whether Perkins would injure Murphy, Detective Bucksner replied "Yes."[155] This objection is without merit.

### iii. Arresting officer's knowledge

Perkins objects to the Commissioner's factual finding that Perkins' arresting officer had knowledge that Perkins was a suspect in Murphy's murder at the time of his arrest because the officer's *report* does not state that Perkins was "wanted for the death of [Murphy] before he made the stop."[156] Corporal Vice testified that, after he saw Perkins, he learned of the murder and received a communication asking if he recognized Perkins.[157] He responded, "Yes…[w]hat did he do now?"[158] It was after this call that he looked for Perkins, found him, and took him into custody.[159]

---

[153] C322.
[154] D84-85, D.I. 167(A) at (i), 3-5. Detective Bucksner testified at Perkins' preliminary hearing held on August 26, 2015 as follows: "The witness also stated that on July 22nd they had a conversation with Perkins in which Mr. Perkins stated he was going to kill Murphy." C41.
[155] C329-31.
[156] Objections at 2.
[157] C349-52.
[158] *Id.*
[159] C352-53.

Whether this was memorialized in a police report is of no consequence. This objection is without merit.

*iv.  Perkins' DNA on the McDonald's cup straw*

Perkins objects to the Commissioner's factual determination regarding DNA found on the straw of one of the McDonald's cups. He argues that because his DNA was only found on the straw of one of those cups, it proves he did not place the cup in that location.[160] While Perkins' DNA was not found on the cup stains, this does not vitiate the fact that Perkins' DNA was found on the straw of the cup, nor does it "prove" that Perkins did not leave the cup at the murder scene. This objection is without merit.

On *de novo* review, the Court adopts all of the Commissioner's factual findings, and now turns to Perkins' six grounds for relief based on IAC.

## C.  Ineffective Assistance of Counsel Claims[161]

Perkins objects to the Commissioner's characterization of his six claims for relief as "IAC claims" because he does not believe they are properly characterized as such.[162] His objection on this point is difficult to understand given that Perkins' only avenue to relief is through IAC claims. To prevail under Rule 61, Perkins must

---

[160] Objections at 2.

[161] The Court condenses a few of the headings and sections in the Commissioner's Report for brevity and clarity.

[162] Objections at 3.

27

show there was cause for relief and prejudice from the violation of his rights.[163]

Because Perkins' claims would otherwise be procedurally barred under Rule 61, Perkins must show an IAC claim amounts to showing of cause for relief.[164] The Commissioner's characterization of the claims as IAC claims benefits Perkins.[165]

While the Commissioner identified six claims for relief, on *de novo* review the Court condenses Perkins' claims into five grounds.[166]

### i. Ground One: Trial Counsel provided Perkins with his chosen defense

Perkins claims that Trial Counsel was deficient in not allowing him to pick his chosen defense. The Commissioner concluded that Perkins' claim is merely conclusory and fails to prove an IAC claim.[167] The Court agrees. As the Commissioner correctly notes:

> [t]rial counsel pursued an identity defense as Perkins asserted that he was not the individual who killed Murphy. Trial Counsel hired a private investigator to attempt to substantiate Perkins' claim that another person at Canby Park killed Ms. Murphy and he merely came upon her after the attack, but the private investigator found no evidence to support his allegations.
>
> Despite the lack of evidence to support these assertions, Trial Counsel nevertheless argued in opening statements and closing arguments that

---

[163] Super. Ct. Crim. R. 61(i)(3).
[164] *Id.*
[165] Comm. Rep. at 21, n.102.
[166] The Court combines the Commissioner's Ground Six: Trial and Appellate Counsels' violations of the Professional Rules of Conduct into her Ground One IAC claims.
[167] Comm. Rep. at 22 (citing *Jordan v. State,* 1994 WL 466142, at *1 (Del. Aug. 25, 1994) (holding that conclusory allegations are legally insufficient to prove ineffective assistance of counsel) (citing *Younger,* 580 A.2d at 556).

28

Perkins was not the killer, and introduced the possibility that Perkins may have tried to help Murphy to explain why Perkins was covered in her blood.

Trial Counsel also questioned witnesses about other people who were seen in Canby Park that day as well as the other 911 calls that were placed around the park area in the early morning hours of July 23, 2015, including that another 911 call had been placed seconds after Murphy's call, to raise reasonable doubt and suggest that perhaps that caller was the killer.

The record reflects that Trial Counsel prepared and presented Perkins' chosen defense, despite the overwhelming evidence against him. . . The fact that the chosen strategy did not yield an acquittal does not make the Trial Counsel's performance legally ineffective under *Strickland*.[168]

Perkins claims his Trial Counsel was ineffective for failing to refute statements that he had a venereal disease. He relies on evidence from laboratory tests conducted while he was in custody of the Department of Correction that yielded results "basically within normal limits."[169] Because Trial Counsel did not present his "negative test" results, Perkins claims that the Commissioner's finding that he chose his defense is incorrect. In support of this argument, Perkins focuses on his July and September 2016 letters to Trial Counsel regarding "errors" in the preliminary hearing transcripts. Those "errors" pertained to the laboratory tests "showing he did not have a disease" and "false statements and mistakes made at his

---

[168] Comm. Rep. at 23-24.
[169] D99-102, D152-55. The laboratory tests to which Perkins referred to were taken at DOC in August 2015 and May 2016, but the exact nature of what he was tested for is unclear, except that the results were deemed "basically within normal limits." *Id*.

preliminary hearing."[170]  The Commissioner determined that Trial Counsel was not deficient because he would have had no logical basis upon which to introduce the results of the laboratory tests taken while Perkins was incarcerated.[171]  Additionally, the Commissioner found that the failure to introduce the results was neither objectively unreasonable nor was Perkins prejudiced by that failure.[172]  The Court agrees.

The State's theory regarding Perkins' motive for the murder was that Perkins *believed* Murphy had given him a venereal disease.  Underwood's testimony established that in the days leading up to Murphy's murder Perkins was angry with Murphy because Perkins believed she had given him a venereal disease,[173] and Perkins told Underwood if she had, he was going to kill her.[174]  Perkins told the police in his interview that two days before Murphy was murdered, he went to Christiana Hospital because a rash had developed after having sex with Murphy the week prior to her death.[175]  Perkins' medical records from Christiana Hospital were admitted into evidence at trial and confirmed he was treated for exposure to a sexually transmitted disease.[176]

---

[170] Objections at 3.
[171] Comm. Rep. at 23-24.
[172] Comm. Rep. at 42-43.
[173] C312-13, C317, C321.
[174] C312-13, C317.
[175] C136, C150-54, C157-58.
[176] C583-84; D75.

Despite all this evidence, Perkins argues that his "normal" test results would have disproved the State's motive theory. He is incorrect and misses the point. The fact that Perkins did not *actually* have a venereal disease does not undermine the State's motive theory. Perkins' *belief* that Murphy had given him a venereal disease was the reason he wanted to kill her. The Court agrees with the Commissioner's determination that "the fact that Perkins may have tested 'normal' after the date of the murder has no bearing on his belief or state of mind at the time of [the] murder."[177]

It is clear from the record, Trial Counsel prepared and presented Perkins' chosen defense. On *de novo* review, the Court agrees with and adopts the Commissioner's finding and determination on Ground One that Perkins fails to establish IAC under either prong of *Strickland*.

### ii. *Ground Two: Trial Counsel's communications were not deficient*

Perkins contends that Trial Counsel failed to communicate with him and did not promptly comply with his requests for legal information.[178] Like his claim for failure to choose a defense, the Commissioner rejected it as conclusory and for

---

[177] Comm. Rep. at 26.
[178] C802-03, C807-08.

failing to meet either prong under *Strickland*.[179]  She also concluded that the record reflects Perkins' contention is factually untrue.[180]  The Court agrees.

On *de novo* review, the Court finds ample support in the record that Trial Counsel communicated with Perkins through letters, at court proceedings, and at in-person meetings.[181]  Trial Counsel reviewed the evidence with Perkins on numerous occasions[182] and had multiple discussions regarding trial strategy.[183]  Additionally, immediately prior to trial, Trial Counsel communicated with Perkins regarding witness statements that implicated him in the killing as well as all the evidence the State intended to present at trial.[184]  The notion that Trial Counsel failed to "respond promptly" is unfounded.

The Court adopts the Commissioner's finding and determination on Ground Two that mere allegations of failing to communicate are insufficient to demonstrate that counsel's performance was deficient or prejudicial under *Strickland*.

### iii.    Ground Three:   Perjury First Degree; and Ground Four: "Prosecutorial Misconduct"

In Ground Three, Perkins argues that his Trial Counsel should not have allowed the State's witnesses to swear falsely and give false statements during their

---

[179] Comm. Rep. at 26.
[180] *Id.*
[181] *See e.g.* C82, C86-87, C101-04, C108, C120-22, C123-25, D89-91, D97-98, D103, D150-51, D156.
[182] C102-04.
[183] D89-91, C82, C86-86, C101-05, C108, C120-25.
[184] D90-91.

testimony.[185]  In Ground Four, he makes a similar conclusory statement that the prosecution allowed the "false" statements to be presented to the jury and therefore misled the jury with "untruthfulness" during trial.[186]  Since both grounds (perjury and prosecutorial misconduct) stem from the same factual findings, the Court consolidates the review below.

The Commissioner correctly determined that the claims asserting false statements, perjury, and prosecutorial misconduct are procedurally barred under Rule 61(i)(3) for failing to raise them on direct appeal.[187]  Because these claims were not raised on direct appeal, the Commissioner recast them as IAC claims and conducted a *Strickland* analysis.

With regard to Perkins' argument that his Counsel should be "punished" for allowing the State's prosecutors to perpetuate "perjury," the Court reviews Trial Counsel's decision not to object to the alleged perjury and prosecutorial misconduct and Appellate Counsel's decision to not object on appeal under a *Strickland*.  Thus, Perkins must demonstrate that his counsel's performance was (1) objectively

---

[185] C802, C807.  By objecting to the Commissioner's characterization of Perkins' claims as IAC claims, Perkins is essentially arguing in favor of a procedural bar.

[186] *Id*.

[187] *Id.* at 29 (citing *Ruffin v. State*, 2019 WL 719038, at *2 (Del. Feb 19, 2019) (holding that claims of prosecutorial misconduct not raised on direct appeal are procedurally barred under Rule 61(i)(3)); *see also Reeder v. State*, 2006 WL 1210986, at *2 (Del. May 3, 2006) (holding that perjury claims raised for the first time on a motion for postconviction relief are procedurally barred under Rule 61(i)(3)).

unreasonable and (2) there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[188]

Rule 61 Counsel in their Motion to Withdraw conducted a thorough review of both Trial Counsel's and Appellate Counsel's responsibility to raise the perjury and prosecutorial misconduct claims during trial and on appeal and found the claims were meritless.[189] The Commissioner found the same.[190]

In support of his argument, Perkins again points to Underwood's prior inconsistent statement. But, the Court has already addressed this inconsistency and finds that on *de novo* review Trial Counsel was not ineffective and Perkins was not prejudiced because he used Underwood's inconsistent statement to impeach Underwood at trial.[191]

Perkins also objects to the Commissioner's finding that "Detective Bucksner did not intentionally lie at Perkins' preliminary hearing."[192] Perkins asserts (for the first time) that during his preliminary hearing when Detective Bucksner was asked by Trial Counsel about Underwood's statements to investigators, Detective Bucksner testified that Underwood told him Perkins made a statement saying "you

---

[188] *Strickland*, 466 U.S. at 694.
[189] D.I. 116-118. Anthony Figliola served as Perkins' Trial and Appellate Counsel. However, because he operated in a different capacity for each of his roles, the Court will review his conduct as Trial and Appellate Counsel separately.
[190] Comm. Rep. at 32.
[191] *Supra* pp 25-26.
[192] Objections at 5.

know, I got her."[193]  Perkins claims this testimony is false because the transcript from Underwood's police interview never referenced any statements by Perkins that he "got her."[194]  This is of no consequence.  It is correct that Detective Bucksner testified at Perkins' preliminary hearing that Underwood told him Perkins said, "I got her" when Underwood saw Perkins at the 4th Street McDonald's the day following the murder.[195]  But, at trial, neither Detective Bucksner nor Underwood testified that Perkins said, "I got her."  Luckily for Perkins, the jury never heard this evidence.[196]

> As Rule 61 Counsel correctly notes:
>
> Any inconsistencies in prior statements and the testimony at trial do not give rise to a postconviction claim. Upon a review of the record, the prosecution did not mislead the jury or engage in misconduct. The prosecutor asked the witnesses questions, to which they responded. Trial counsel had an opportunity to cross-examine witnesses regarding any inconsistencies in their testimony from prior statements.[197]

The Court agrees with Rule 61 Counsel and adopts the Commissioner's determination that Perkins' IAC claims regarding perjury and prosecutorial misconduct are without merit and fail *Strickland*.[198]

---

[193] *Id.*
[194] *Id.*
[195] C61-62.
[196] *See generally*, C309-327, C328-331.
[197] *Id.*
[198] Comm. Rep. at 32.

### iv. Ground Five: "The Use of False Evidence"

#### 1. Trial Counsel was not unreasonable when deciding not to test some of Perkins' clothing for DNA

Perkins argues that Trial Counsel should have presented evidence that some of his clothing was not tested for DNA, and the use of such evidence at trial was "false evidence."[199] The Commissioner found that, as a free-standing claim, Perkins' "use of false evidence" assertion "is procedurally barred under Rule 61(i)(3) because he failed to raise it in the proceedings leading to his conviction, and as such, should be summarily dismissed."[200] The Court agrees. But the Commissioner gave Perkins the benefit of the doubt and reviewed this claim on its merits.[201]

While it is true the State did not test all of Perkins' clothing for DNA, as the Commissioner correctly notes, "Delaware law does not require that the State perform any specific testing on the physical evidence it gathers."[202] Trial Counsel was not ineffective for failing to raise an objection because such an objection would have

---

[199] C803, C808; D80-88.
[200] Comm. Report. at 33.
[201] Comm. Rep. at 34 ("In his subsequent *pro se* filings, however, Perkins attempts to couch the same 'use of false evidence' argument into one of ineffective assistance of counsel by claiming that Trial Counsel was ineffective for failing to (i) present evidence that some of his clothing was not tested for DNA; (ii) object to police testimony that his blue shirt and keychain had blood stains on them; (iii) object to police testimony that he was wearing orange sweatpants over his blood-stained blue sweatpants; and (iv) file a motion to suppress with respect to certain evidence.").
[202] *Dennis v. State*, 2013 WL 1749807, at *3 (Del. Apr. 23, 2013) (citing *Anderson v. State*, 1999 WL 504332, at *3 (Del. Mar. 18, 1999); Comm. Rep. at 36.

been meritless. Lindauer testified with specificity regarding which items were tested for DNA, and the DNA tests were performed to determine whether the blood on the items tested was Murphy's.[203]

The State did not elicit "false evidence" by admitting into evidence Corporal Vice's observations regarding the physical evidence. Perkins' argument is that the photos of the clothing presented to the jury showed "no visible blood," and if his Trial Counsel raised this, it would "prove" the State introduced false evidence.[204] Perkins' claim is without merit. The testimony of the police officer who collected Perkins' clothing at the time of his arrest testified about what he observed: what *appeared* to be dried blood on the keychain, knife blade, long-sleeve thermal t-shirt, blue t-shirt, blue sweatpants, and boots.[205] Although the blue t-shirt Perkins wore under the gray long-sleeve thermal t-shirt was not tested for blood or DNA, this does not make it "false." Witnesses are not precluded from testifying about what they observed simply because the photographs of the clothing do not show signs of visible blood.

Although the orange sweatpants were not tested for blood or DNA, Kish's testimony as to what he observed on the sweatpants was properly admitted. The same is true of Corporal Vice's testimony—that Perkins was wearing orange

---

[203] C473-97.
[204] Objections at 9.
[205] C400-10.

sweatpants over his blue sweatpants at the time of his arrest, he observed "blood all over the blue sweatpants," and when he pulled the orange sweatpants down slightly, he saw "a bunch of blood, fresh blood, [not] dried up blood," in Perkins' pocket.[206] This is not "false evidence," and Trial Counsel would have had no good faith basis to file a motion to suppress as to any of this testimony.

The Commissioner determined that Trial Counsel was not ineffective because he failed to object to the introduction of Perkins' clothing when there was not a basis for the objection.[207] The Court agrees.

### 2. Trial Counsel was not deficient by failing to obtain a voice expert

Perkins claims the 911 call was a "use of false evidence" because he disputes that the male voice on the call was his and takes issue with the testimony of his probation officer who identified his voice.[208] Perkins contends his Trial Counsel was ineffective for failing to investigate and arrange for a voice expert to refute that evidence and testify that the voice on the 911 call was not his.[209] The Commissioner deemed this claim procedurally barred under Rule 61(i)(4),[210] the Commissioner states:

---

[206] C353.

[207] *Id.* at 37.

[208] D83-88.

[209] *Id.*; D.I. 169(A).

[210] Comm. Rep. at 38 ("The issue regarding the admissibility of the testimony of Perkins' probation officer regarding his identification of Perkins' voice on the 911 call was previously adjudicated by this Court and is therefore barred by Rule 61(i)(4). No Rule 61 exceptions apply.").

[t]he issue regarding the admissibility of the testimony of Perkins' probation officer regarding his identification of Perkins' voice on the 911 call was previously adjudicated by this Court and is therefore barred by Rule 61(i)(4). No Rule 61 exceptions apply.[211]

Perkins perseverates, objecting now to the Commissioner's explanation that the decision to call a voice expert was well within Trial Counsel's discretion and his decision not to do so was not ineffective.[212] Perkins maintains that expert testimony would have "prove[d] the use of false evidence, since John French is the only witness claiming it's my voice who isn't a voice expert and I claim it is not my voice."[213]

The Commissioner correctly determined that Trial Counsel's decision not to call a voice identification witness fails under *Strickland* because it is unlikely that such a witness would have changed the result of the trial.[214] The jury heard on the audiotape of the 911 call the speaker refer to himself as "G," and Underwood testified Perkins went by this nickname."[215] The jury heard Underwood say he met Perkins through a friend named "Jimmy," and the male speaker makes reference to a "Jim" on that 911 call.[216] Finally, the jury heard Perkins' voice when portions of

---

[211] Comm. Rep. at 38 (internal citations omitted).
[212] Comm. Rep. at 39.
[213] C803-08.
[214] Comm. Rep. at 39.
[215] C310-12, C576.
[216] *Id.*

his interview were played during the trial.[217]  The Court finds this objection without merit and agrees with the Commissioner's Report.

                     3.   There was no suppression issue at the time of the arrest

Perkins claims that Trial Counsel was ineffective for failing to file a motion to suppress his warrantless arrest in violation of his Fourth and Fourteenth Amendment rights.[218]  He argues Appellate Counsel was likewise ineffective for failing to raise this issue on direct appeal.[219]  The Commissioner determined that this claim is without merit because there was sufficient probable cause to arrest Perkins and the search was incident to his arrest.[220]  Murphy's body was found on the morning of July 23, 2015, at approximately 8:00 a.m., and Perkins was arrested at approximately 5:30 p.m.[221]  A search warrant was executed at 7:57 p.m.[222]  During that timeframe, enough evidence was gathered to establish probable cause. Detective Bucksner did not testify that Perkins was *not* a suspect at the time of his arrest; to the contrary he stated that at the time the investigators first found Murphy's

---

[217] C581.

[218] D83-88. Perkins contends all evidence seized was illegally obtained because it was not pursuant to a warrant. D87-88, D.I. 167(A). This contention is without merit.

[219] *Id.*, D.I. 169(A).

[220] Comm. Rep. at 47.  *U.S. v. Robinson*, 414 U.S. 218, 235 (1973) ("[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification . . . it is the fact of the lawful arrest which establishes the authority to search.").

[221] C29-30.

[222] *Id*.

body, Perkins was not yet a suspect.[223] Once the police identified the victim as Murphy, Perkins became a suspect.[224] Although on the video footage, Perkins and Murphy do not appear to be fighting at the McDonald's eight hours prior to her murder, that does not, as Perkins argues, establish a lack of probable cause.[225] The video establishes they were together eight hours before the murder, shows them with the McDonald's cups, and shows Perkins with a green grocery bag.

There was no good faith basis for Trial Counsel to file a suppression motion given the facts here. Trial Counsel recognized this and advised Perkins that there was no colorable basis for filing a motion.[226] Likewise, Appellate Counsel was not deficient for failing to raise a meritless issue on appeal. For the foregoing reasons, the Commissioner's Report is **ADOPTED** and Perkins' Motion for Postconviction Relief is **DENIED.**

### D. Rule 61 Counsel's Motion to Withdraw

On February 19, 2021, Rule 61 Counsel filed a Motion to Withdraw as Postconviction Counsel pursuant to Superior Court Criminal Rule 61(e)(6). Rule 61(e)(6) provides that:

> [i]f counsel considers the movant's claim to be so lacking in merit that counsel cannot ethically advocate it, and counsel is not aware of any other substantial ground for relief available to the movant, counsel may

---

[223] C54-55.
[224] *Id.*
[225] Objections at 10-11.
[226] D.I. 115-118. *See* Motion to Withdraw as Counsel along with the accompanying Memorandum in Support of Motion to Withdraw and Appendix.

move to withdraw. The motion shall explain the factual and legal basis for counsel's opinion and shall give notice that the movant may file a response to the motion within 30 days of service of the motion upon the movant.[227]

Rule 61 Counsel represents that, after undertaking a thorough examination of the record to evaluate Perkins' claims, they determined the claims to be so lacking in merit that Counsel cannot ethically advocate them.[228] They are not aware of any other substantial claims for relief available to Perkins.[229] Because they find no potential meritorious grounds on which to base a Rule 61 motion, they seek to withdraw as counsel.[230] The Court is satisfied that Rule 61 Counsel has made a conscientious and thorough examination of the record and upon *de novo* review of the record, the Court finds that Perkins' Rule 61 Motion is devoid of any meritorious postconviction claims. Consequently, Rule 61 Counsel's Motion to Withdraw is **GRANTED**.[231]

E.    Perkins' Motion to Substitute Rule 61 Counsel

Because Perkins' Rule 61 Motion is denied, Perkins' Motion for Substitute Rule 61 Counsel is **DENIED AS MOOT.**

---

[227] Super. Ct. Civ. R. 61(e)(6).
[228] *Id.*
[229] *Id.*
[230] *Id.*
[231] *Matos v. State*, 2015 WL 5719694, at *2 (Del. Sept. 29, 2015).

## V. CONCLUSION

After careful and *de novo* review, the Court accepts and **ADOPTS**, in whole, the Commissioner's Report.[232] Defendant's Motion for Postconviction Relief is **DENIED,** Rule 61 Counsel's Postconviction Counsel's Motion to Withdraw is **GRANTED,** and Perkins' Motion for Substitute Rule 61 Counsel is **DENIED AS MOOT.**

    **IT IS SO ORDERED**.

/s Jan R. Jurden
Jan R. Jurden, President Judge

oc: Prothonotary
cc: Carolyn S. Hake, Esquire
     Patrick J. Collins, Esquire
     Kimberly A. Price, Esquire
     Anthony A. Figliola, Jr., Esquire
     Gary Perkins (SBI #285925)

---

[232] *See* Super. Ct. Crim. R. 62(a)(5)(iv) ("A judge may accept, reject, or modify, in whole or in part, the findings of fact or recommendations made by the Commissioner.").